T.C. Memo. 2008-34

UNITED STATES TAX COURT

RONALD B. AND ANNETTE C. TALMAGE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13002-05.                    Filed February 19, 2008.

<u>Robert G. Burt</u>, for petitioners.

<u>Shirley M. Francis</u> and <u>Aimee R. Lobo-Berg</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Respondent determined deficiencies in Ronald
B. Talmage's Federal income tax for 1998, 1999, 2000, and 2001 of
$532,265, $845,454, $1,189,294, and $108,913, respectively, as
well as additions to tax for 1998 and 1999 under section
6651(a)(1) of $53,226 and $84,923, respectively, and fraud
penalties under section 6663(a) for 1998, 1999, 2000, and 2001 of

$399,199, $627,542, $885,033, $79,684, respectively.[1]  Respondent

also determined a deficiency in Ronald B. and Annette C.

Talmage's Federal income tax for 2002 of $80,609, as well as a

fraud penalty under section 6663(a) of $57,886 with respect to

Ronald B. Talmage and an accuracy-related penalty under section

6662(a) of $15,436 with respect to Annette C. Talmage.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.  Amounts are rounded to the nearest dollar.

After concessions,[2] the issues for decision are: (1) Whether certain wire transfers from Hong Kong to the United States in 1998, 1999, 2000, 2001, and 2002 constitute nontaxable loans; (2) whether Ronald B. Talmage (petitioner) failed to report unexplained bank deposits in 1998, 2001, and 2002 of $36,263, $13,454, and $42,553 respectively; and (3) whether petitioner failed to report gains from the sale of rental property in Vancouver, Washington, and a vacation home in Black Butte, Oregon, for 1998; (4) whether petitioner is entitled to

---

[2] Respondent concedes that the gains from the sale of the Vancouver, Washington, and Black Butte, Oregon, properties in 1998 were $31,231 and $120,606, respectively.

Respondent concedes that the bank deposit of $265,269 on Aug. 24, 1998, to the Talmages' account No. * * * 3034 with the US Bank comprised the proceeds from the sale of the Black Butte, Oregon, property. As a result, only $36,263 of the unexplained bank deposits for 1998 is in dispute.

Respondent concedes reductions for the wire transfers from New Century Properties, Ltd. (NCPL), to A.C. Schommer & Sons, Inc. (SSI), in 1999 and 2000 of $10,000 and $246,057, respectively.

Respondent concedes a reduction for the wire transfers from NCPL to petitioner for child support in 2002 of $7,320.

Petitioner concedes FICA tax on unreported wages for 1999, 2000, and 2001 of $3,773, $5,942, and $5,191, respectively.

Petitioner concedes that losses on Schedules F, Profit or Loss From Farming, for 2000, 2001, and 2002 of $31,239, $9,706, and $22,875, respectively, were for activities not engaged in for profit pursuant to sec. 183.

Petitioner concedes that the assessment of a deficiency for 1998 is not barred under sec. 6501(a).

the full amount of the foreign earned income exclusion for 1999;
(5) whether petitioner is liable for additions to tax under
section 6651(a)(1) for 1998 and 1999; (6) whether petitioner is
liable for civil fraud penalties under section 6663(a), or in the
alternative, accuracy-related penalties under section 6662(a) for
1998, 1999, 2000, 2001, and 2002; (7) whether petitioner Annette
Talmage is liable for the accuracy-related penalty under section
6662(a) for 2002; and (8) whether the assessment of deficiencies
for 1999 and 2000 is barred under section 6501(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.
The stipulation of facts and the attached exhibits are
incorporated herein by this reference.  Petitioners resided in
Corbett, Oregon, when their petition was filed.

A.  Background

Petitioner was born and raised in Utah.  After he graduated
from high school in 1971, petitioner enrolled at Brigham Young
University (BYU) in Provo, Utah.  In 1972, petitioner left BYU to
serve a 2-year mission in Japan for the Church of Jesus Christ of
Latter-Day Saints.  While on his mission, petitioner met Kumiko
Wako and returned with her to Salt Lake City, Utah, where they
married on August 12, 1975.  Petitioner re-enrolled at BYU and
graduated with a degree in business administration and Asian
studies.  In February 1978, petitioner and Kumiko Wako Talmage

(Kumiko Talmage) moved to Ikuta, Japan, where petitioner temporarily worked at a language school. Petitioner and Kumiko Talmage (Talmages) have three children: Lisa Talmage Allen, born in 1976, Korianton Edward Talmage (Kory Talmage), born in 1978, and Lillian Talmage, born in 1984.

Beginning in January 1979, petitioner was employed in Japan to work on various real estate developments and investments and to provide investment advisory services.

In May 1990, the Talmages purchased a vacation home in Black Butte, Oregon (Black Butte property), for $145,000. In June 1990, the Talmages also purchased, as a rental property, a home in Vancouver, Washington (Vancouver property), for $101,900.

On November 17, 1997, the Talmages purchased 47.73 acres of property for $903,000 at 35701 NE Chamberlain RD, Corbett, Multnomah County, Oregon (Rivercliff property), to develop into a permanent residence and farm. At the closing, the Talmages paid $383,967 in cash as a downpayment and gave the seller a promissory note for $519,033 with a trust deed on the Rivercliff property to secure the unpaid balance. In February 1998, petitioner paid the balance owing on the $519,033 promissory note with funds wire transferred by New Century Properties Limited (NCPL).[3] Petitioner did not report the $519,033 as income on his

---

[3] NCPL is a British Virgin Islands registered corporation organized on Feb. 28, 1991, with authorized capital of $50,000.
(continued...)

Form 1040, U.S. Individual Income Tax Return, for 1998 (1998 return).

The Rivercliff property is in the protected Columbia River Gorge National Scenic Area. Any development plan for the Rivercliff property is subject to land use review by the Columbia Gorge Commission, which comprises representatives from cities and counties on both sides of the Columbia River. The Talmages could not place improvements on the Rivercliff property until they satisfied the land use rules, received the approval of Multnomah County, and obtained building permits from the city of Gresham, Oregon. A "watchdog" group called Friends of the Columbia Gorge also participated in the review process.

At the date of purchase, the Rivercliff property was zoned for a single-family dwelling. The improvements on the property included a small modular home, the original farm dwelling (being used as a storage building), a barn with outbuildings, a kennel building with multiple dog runs, a gazebo, and a garden shed.

In 1998, the Talmages engaged the services of Philip McCurdy (Mr. McCurdy), a Portland architect, and began working on plans to raze the existing modular home and build their dream home, renovate the original farm dwelling, build a traditional Japanese tea house, install a three-horse stable, install farm pasture

---

[3](...continued)
Although NCPL is registered in the British Virgin Islands, its offices are in Hong Kong.

fencing, improve the existing barn, build a tennis court,[4] rebuild the existing kennel facility and dog runs, and improve the other existing structures, including paving access roads with asphalt. Petitioner paid Mr. McCurdy $33,649 for architectural services in 1998.

The Talmages' building permits reflected the following expected costs for doing the work, all of which was to be completed by June 1999:

| Permit No. | Item | Cost |
|---|---|---|
| 7703 | Barn | $120,000 |
| 5804 | Dog kennel | 15,000 |
| 6106 | Building | 294,780 |
| 10345 | Pole barn, pad, kennel conversion | 80,000 |
| Total | | 509,780 |

The Talmages also planned to raise horses and dogs for personal purposes and to actively farm the land, including raising vegetables and fruit and harvesting hay to feed their horses. Petitioner's dogs included four Irish setters who were family pets he trained and showed in competitions as a hobby.

The Talmages, upon recommendation by their architect, retained A.C. Schommer & Sons, Inc. (SSI), as their general contractor for work on the Rivercliff property. On April 20, 1998, petitioner and SSI entered into a contract to renovate the original dwelling for $47,801 so that the Talmages could live in

---

[4] Kumiko Talmage was an avid tennis player who participated in tournaments.

it until construction of the new home was completed.  Kumiko Talmage did not sign the contract.

The Talmages submitted an application for approval of their plan of development of the Rivercliff property to Multnomah County on May 5, 1998, but it was rejected as incomplete on July 2, 1998.  Throughout 1998 problems were encountered in obtaining building permits.  To overcome these problems, the Talmages hired land use attorneys, engineers, and consultants to assist them. Ultimately, substantial site improvements were required, costs began to escalate, and development of the property was delayed. On August 14, 1998, the Talmages and SSI received a stop work order from Multnomah County requiring the Talmages to pay fines for land-disturbing activities.

Beginning July 2, 1998, petitioner wrote three letters (one on his attorney's stationery) to Multnomah County emphasizing the need to expedite the process to obtain the building permits because of his goal to permanently move himself and his family to the Rivercliff property by the spring of 1999.

On July 10 and August 21, 1998, the Talmages sold the Vancouver and Black Butte properties for $147,000 and $284,000. The sales resulted in long-term capital gains of $31,231 and $120,606, respectively.  The title companies handling the closings reported the sales on Forms 1099-S, Proceeds From Real Estate Transactions.  The proceeds from the sale of the Black

Butte property were deposited in the Talmages' account at US Bank. The record does not reflect where the proceeds from the sale of the Vancouver property were deposited. The proceeds from the sales of the properties were used for the Talmages' personal expenses and to develop the Rivercliff property.

Petitioner did not report receiving any income from the sale of the Vancouver or the Black Butte property on his 1998 return. Petitioner also did not report receiving rental income or claim deductions for depreciation, mortgage interest, or property tax with respect to the Vancouver property on his 1998 return.

On November 3, 1998, petitioner paid $5,785 in property taxes for the Rivercliff property.

On December 8, 1998, SSI's bookkeeper sent a memorandum by facsimile to petitioner stating:

> The following invoice is the remainder due for November.
>
> Also, there is an "Invoice Summary" recapping all invoice's due with the billing address of your company. Is this what you were looking for in the way of billing to your company?
>
> If you could confirm that the company, TPP Limited [TPPL], is solely owned by you we would appreciate it.

On December 23, 1998, TPPL wire transferred $249,193 to SSI for the remainder due on the development of the Rivercliff property in 1998. Petitioner did not report the $249,193 as income on his 1998 return.

On December 23, 1998, petitioner signed an employment contract[5] with NCPL by which petitioner was to receive $7,000 a month in compensation, his and his family's health, auto, and life insurance premiums, and bonuses.  The contract also provided for the possibility of loans from NCPL to petitioner in order for petitioner to purchase a home.

Petitioner entered into a purported loan agreement with NCPL dated January 25, 1999, to borrow funds for the development of the Rivercliff property, the terms of which were:

> **Between:**
> New Century Properties Limited of 1520 Prince's Building, 10 Charter Road, Hong Kong ("*Lender*"), and:
> Ronald B. Talmage & Kumiko W. Talmage of 1-31-5 Sakura Shin-machi, Setagaya-ku, Tokyo, Japan (collectively the "*Borrower*")
>
> **Whereas:**
> Ronald B. Talmage is under the employ of New Century Properties Limited
> and,
> *Borrower* (husband and wife) together own a certain property in the United States, located at 35701 NE Chamberlain Road, Corbett, Oregon 97019 ("*The Property*")
> and,
> *Borrower* is desirous of borrowing a sum of money for the construction of various improvements to *The Property*,
> and
> *Lender* is willing to lend *Borrower* a sum of money to facilitate the same,

---

[5]The Court's use of the words "employment contract", "employee", "employer",  "loan agreement", "loan", and similar terms is for convenience only and does not indicate the Court's agreement that such words reflect the substance of what transpired.

-the undersigned agree to the following terms:-

(1) *Lender* shall provide a line of credit to *Borrower* to facilitate the development, renovation and construction of various facilities and improvements on *The Property*.

(2) The precise amount loaned shall be dictated by the direct construction costs incurred in the production of these facilities on *The Property*.

(3) Billings will be made by A.C. Schommer & Sons ("*Construction/Contractor*") directly to the *Lender*, and *Lender* shall remit such payments directly to the *Construction/Contractor* accordingly.
All sums to be loaned must be conducted as payments in response to a direct billing by *Construction/Contractor*.

(4) The total to be loaned shall be calculated from time to time in accordance with budgets and needs for the proposed improvements on *The Property*, and by mutual counsel and consent of both *Lender* and *Borrower*. A confirmation document showing the amount loaned to date shall be provided by *Lender* and agreed to by *Borrower* from time to time.
Upon final completion of all of the agreed to improvements on *The Property* (projected to be Summer of 2001), a final statement shall be issued by the *Lender*, showing the total sum loaned, at which time this shall be countersigned in agreement by the *Borrower*.

(5) Repayment of the sum loaned shall begin precisely Five-years from the date of this agreement, being no later than January 25, 2004. Repayment shall be in accordance with an amortization schedule that *Lender* shall provide *Borrower* on or by that date of initial repayment.

(6) Interest shall be accrued at the rate of 5.25% per annum, and shall be payable in accordance with the amortization schedule to be provided by *Lender*.

(7) Security on the loaned funds shall be in the form of, firstly, a lien on Ronald's salary as paid by New Century Properties Limited, and secondly, at an appropriate time, a mortgage or lien on *The Property*. It is understood at the time of this signing however,

that the *Borrower* seeks to obtain permanent mortgage secured financing from a local US bank or lending institution to facilitate a portion or all of the costs of the intended improvements to *The Property*. Thus as of the time of this signing, in order to cooperate with the *Borrower* for this potential source of borrowing, the requirement of a recorded mortgage in favor of the *Lender*, shall not be immediately necessary. This does not excuse the *Borrower* from any repayment liability however, and in the event of the obtaining of institutional funding, the *Borrower* agrees to repay of portion or all of the funds loaned by the *Lender*. In either case, *Lender* shall retain a First Priority position for repayment of monies obtained.

(8) The *Lender* reserves the right to require a First Mortgage to be recorded in his favor as he deems necessary. Further, in the event of failure to repay the funds borrowed, *Borrower* agrees to deed *The Property* over to the *Lender* for use and or disposal as he deems necessary.

(9) The Term of this loan shall be Twenty-years from the date of this agreement, wherein on or before the 25th of January 2019, the total sum loaned, plus interest accrued to date on any outstanding balance, shall be due and payable in full. In the event the full amount is not paid by this date, the *Lender* shall exercise his right for foreclosure on *The Property*.

(10) This loan agreement shall be governed under the Laws of the State of Oregon, USA, wherein *The Property* is located, and *Borrower* intends to establish residency in due course on *The Property*.

The loan agreement was signed by petitioner and by Mr. Seki on behalf of NCPL.[6] The loan agreement did not have a signature line for Kumiko Talmage and was not signed by her. At the time this document was signed, Kumiko Talmage was unaware of its existence

_____

[6] Mr. Seki has been represented by petitioner to be the owner of NCPL. Kumiko Talmage testified that Mr. Seki worked for petitioner. Mr. Seki could not read or write English.

and was unaware of any loans with respect to the Rivercliff property.

On April 15, 1999, Multnomah County issued a decision approving the Talmages' application to develop the Rivercliff property. However, on April 23, 1999, the Friends of the Columbia Gorge appealed the decision with respect to the Talmages' plans to build a new home. An appeal hearing was held on the matter on May 21, 1999.

On June 9, 1999, petitioner, Kumiko Talmage, and Lillian Talmage moved from Japan to the Rivercliff property and took up residence in the original farm dwelling. Petitioner paid the Cascade Athletic Club $912 with a check dated June 10, 1999, for Kumiko Talmage's club membership fees. Petitioner's address listed on the check was the Rivercliff property address.

On June 28, 1999, Multnomah County approved the construction of one replacement dwelling for single-family use, subject to a number of conditions. Petitioner, not having received the approval, on June 29, 1999, mailed a letter to Multnomah County stating that he and his family had not been able to attend the May 21, 1999, appeal hearing because they had been in the process of moving from Japan to the Rivercliff property. The letter also stated that as of June 29, 1999, petitioner and his family permanently resided on the Rivercliff property and the Friends' appeal had become a "considerable and very real burden to [their]

daily life". Petitioner's address listed on the letter was the Rivercliff property address.

On July 9, 1999, the Multnomah County issued a Clarification of Land Use Hearings Officer's Conditions of Approval (clarification) authorizing only one family dwelling on the Rivercliff property. The clarification required that the use of the original farm dwelling as a residence be discontinued when the Talmages' new home was completed. Sometime in July, after receiving the clarification, petitioner and Kumiko Talmage signed a replacement dwelling agreement with Multnomah County in which they agreed that the Rivercliff property could have only one dwelling unit, and the original farm dwelling would not be used for residential purposes once the Talmages' new home was occupied.

On July 27, 1999, the Talmages applied for a new construction permit for the Rivercliff property with the condition that original farm dwelling be converted to nonresidential use within 3 months of their occupying their newly constructed home. The application stated that the property owners were petitioner and Kumiko Talmage.

On September 21, 1999, petitioner untimely filed his 1998 Federal income tax return with a filing status of married filing

separately, which listed Tokyo, Japan, as his home address.[7]  The

1998 return reported wages of $58,736, taxable interest of

$4,446, and an exclusion of $58,736 on Form 2555, Foreign Earned

Income, and claimed personal exemptions for petitioner and Kumiko

Talmage and dependency exemptions for their three children

resulting in petitioner's calculation of "0" taxable income.  The

1998 return did not claim a deduction for interest paid.

The total funds wire transferred by NCPL to SSI for the

development of the Rivercliff property during 1999 were

$2,119,464.  Petitioner did not report the $2,119,464 as income

on his Form 1040 for 1999 (1999 return).

On March 15, 2000, the Talmages separated, and Kumiko

Talmage moved from the Rivercliff property to an apartment in

Gresham, Oregon.  From March 15 through June 12, 2000, she

withdrew $120,582 from the family bank accounts.

On May 11, 2000, petitioner untimely filed his 1999 return

with a filing status of married filing separately, which listed

Tokyo, Japan, as his home address.  The 1999 return reported

$76,560 of foreign earned income on Form 2555 and claimed a

maximum foreign earned income exclusion of $74,000, but it did

not report the $2,560 excess as wages on line 7 of page 1 of Form

1040.  The Form 2555 reported that petitioner, Kumiko Talmage,

---

[7] In April 1999, petitioner filed an extension to extend the filing date for his 1998 return to Aug. 16, 1999.

Kory Talmage, and Lillian Talmage resided together in Japan throughout 1999.  Petitioner did report taxable interest of $3,428 and claimed personal exemptions for himself and Kumiko Talmage and dependency exemptions for Kory Talmage and Lillian Talmage resulting in petitioner's calculation of "0" taxable income.  The 1999 return did not claim a deduction for interest paid.

On June 1, 2000, Kumiko Talmage filed for divorce. Petitioner's immediate reaction was to prepare, or have prepared and signed, three documents, all dated June 16, 2000; i.e., an addendum to his employment agreement dated December 31, 1998, a loan reconfirmation agreement, and a letter written by Mr. Seki to petitioner and Kumiko Talmage which set out the total amount purportedly lent to date.

The addendum to the December 23, 1998, employment contract, dated June 16, 2000, stated:

> [Petitioner] is employed by NCPL in accordance with the
> terms of the Employment Contract executed the 23rd day
> of December 1998,
> and
> RBT is currently undergoing a marital dispute,
> -- The undersigned agree to the following adjustment to
> RBT's remuneration/compensation package:
>
> (1) [Petitioner's] monthly salary [is] temporarily
> increased to US$9,000 per month during the period of
> "Temporary Family Support" as dictated by the pending
> divorce filing by his spouse, Kumiko W. Talmage (filing
> dated June 1, 2000, with Multnomah County, State of
> Oregon, USA).

(2) The actual disbursement of these funds shall be US5,000 to [petitioner's] designated account with US Bank, and US4,000 to Kumiko Talmage's personal account as designated by RBT.

(3) Further NCPL agrees to loan [petitioner] marriage settlement monies in the event of a successful settlement with Kumiko, the specific details of which shall be determined by [a] separate loan agreement.

NCPL wishes Ron and Kumi the best in their settlement of this matter and hope for a peaceful and speedy reconciliation.

Petitioner did not report the $4,000 portion of his salary disbursed to Kumiko Talmage as income on his Form 1040 for 2000 (2000 return).

The purported loan reconfirmation agreement with NCPL, dated June 16, 2000, stated:

**Between:**
New Century Properties Limited of 2503 Bank of America Tower, 12 Harcourt Road, Hong Kong ("Lender"),

**and:**
Ronald B. Talmage of 35701 NE Chamberlain Road, Corbett, Oregon 97019 ("Borrower")

**Whereas:**
Ronald B. Talmage and his spouse, Kumiko W. Talmage collectively executed a Loan Agreement dated the 25th of January 1999 ("*The Loan*") with *Lender*,
and
Ronald B. Talmage and his spouse, Kumiko W. Talmage are jointly the owners of a certain property located at 35701 NE Chamberlain Road, Corbett, Oregon, USA ("*The Property*"),
and
Ronald B. Talmage and his spouse, Kumiko W. Talmage collectively have an existing liability with regards to funds borrowed from the *Lender*, via *The Loan* and have pledged certain security via *The Loan* inclusive of *The Property* itself,
and

Ronald B. Talmage and his spouse, Kumiko W. Talmage are as of the date of this Agreement, undergoing a marital separation (beginning with the departure of Kumiko from *The Property* as of March 21, 2000), possibly to result in divorce (subsequent to the Kumiko's filing with the County of Multnomah, State of Oregon, USA dated June 1, 2000),
and
Kumiko has also requested and the Family Court of the County of Multnomah, State of Oregon, USA has subsequently issued Court Order dated the 1st of June, 2000, that personal finances of the husband and wife collectively and respectively are to be restrained,
and
Subsequent to Kumiko's filing and Court Order, there has arisen a possible new risk as to the security and repayment of *The Loan*, and a possible question concerning further funds to be loaned by the *Lender* to the *Borrower*,
-- The undersigned hereby agree to the following:

(1) As of the date of signing of this Agreement, *Borrower* and *Lender* hereby confirm that the sum total of principal loaned to Ronald B. and Kumiko W. Talmage collectively via *The Loan* currently stands at: US$3,431,319.65 (Three million four hundred thirty-one thousand three hundred nineteen US Dollars and sixty-five cents).

(2) The *Borrower* reconfirms all commitments, repayment and security as per the terms of *The Loan*, respective of Kumiko's present or future claims or position on the matter.

(3) *The Lender* hereby requests the *Borrower* to record a First Mortgage in favor of the *Lender*, on *The Property*. In light of the recent divorce filing by Kumiko, and subsequent Financial Restraining Order, the *Borrower* hereby confirms that he will do his best to secure this Mortgage for the *Lender*, and/or provide additional collateral to further secure *The Loan*.

(4) The *Lender* reconfirms his intent to assist the *Borrower* via additional funds to be loaned through completion of the planned improvements on *The Property*, as per the original terms and conditions of *The Loan*.

(5) *Lender* hereby states and *Borrower* agrees that in the event that *The Loan* is contested by Kumiko W. Talmage and/or her attorney, *Lender* reserves the right to file suit in the County of Multnomah, State of Oregon USA, for damages against Kumiko and *Borrower* towards recovery of *Lender's* loaned funds, his First Security interest in *The Property*, and/or foreclosure on *The Property* as per the terms of *The Loan*.

(6) All other terms as per *The Loan* remain in effect and are hereby reconfirmed by the undersigned.

The loan reconfirmation agreement was signed by petitioner but not by Kumiko Talmage.

On July 23, 2000, petitioner sent an e-mail message to Stephen C. Schommer (Mr. Schommer) (the vice president of SSI) titled "Letter rewrite" containing instructions and three letters written by petitioner. The e-mail message instructed Mr. Schommer to replace two draft letters Mr. Schommer had written and given to petitioner for review with two of the three letters contained in the e-mail. The third letter contained in the e-mail was only for Mr. Schommer's reference. The e-mail also instructed Mr. Schommer to have the revised letters typed and sent as SSI correspondence. Mr. Schommer complied with petitioner's requests.

On July 31, 2000, Mr. Schommer mailed as SSI correspondence the first of the e-mailed letters (written by petitioner) to Mr. Seki, purportedly the chief executive officer (CEO) of NCPL, which stated:

Dear Mr. Seki,

Attached herewith please find the record of payments (inclusive of bank remittance documentation) received to date by A.C. Schommer & Sons, Inc. for RiverCliff construction work, from New Century Properties Limited.

The total received as of the date of this letter stands at: $3,666,084.62 (Three million six hundred sixty-six thousand eighty-four US dollars and sixty-two cents).

We appreciate your kind letter of the 16th of June reconfirming your commitment to continue with payments through completion of the project.

Should there be any questions, please contact me at any time.

Petitioner's July 23, 2000, e-mail message to Mr. Schommer also stated:

For your information the "June 16 letter" from Mr. Seki referred to above, contains the following text. The signed original of this letter shall be presented to you upon my return from Asia on the 2nd.

The text petitioner referred to in his July 23, 2000, e-mail message was a letter allegedly written by Mr. Seki, which stated:

Dear Mr. Schommer,

We hereby confirm that we have paid in full all of your invoices issued us to date, subject to construction work for RiverCliff Farm. As of the date of this letter we have paid you the sum total of:

US$3,431,319.65 (Three million four hundred thirty-one thousand three hundred nineteen US Dollars and sixty-five cents).

These funds have been paid you on behalf of our borrowers, Ronald B. & Kumiko W. Talmage collectively, in accordance with the terms of a loan agreement we executed with them dated January 25, 1999.

>We further hereby reconfirm our commitment to provide continued lending to Ronald B. Talmage via direct payment to your future invoices for RiverCliff Farm work, through completion of the planned improvements and construction.

Mr. Schommer eventually received the June 16, 2000, letter and kept it with his company's books and records. At trial, petitioner offered this letter into evidence as a letter written and mailed by Mr. Seki to Mr. Schommer.

On July 31, 2000, Mr. Schommer also mailed as SSI correspondence the second of the e-mailed letters (written by petitioner) to the Talmages, which stated:

>Dear Ron and Kumi:

>Attached herewith please find the record of payments (inclusive of bank remittance documentation) received to date by A.C. Schommer & Sons, Inc. for RiverCliff construction work, directly from yourselves.

>The total received directly from you as of the date of this letter stands at: $412,965.76 (Four hundred twelve thousand, nine hundred sixty-five dollars and seventy-six cents).

>Further to this, for your reference, I am also enclosing a copy of my letter and similar information sent directly to your lender, New Century Properties Limited for their portion of the payments made to date.

>We sincerely wish you the best in a peaceful and speedy resolution to your current challenges. Our prayers are with you.

At this time, Kumiko Talmage was not aware of a company named New Century Properties Limited or that any money had been lent to the Talmages to develop the Rivercliff property.

Petitioner hired Eric C. Larson (Mr. Larson), to represent him in the divorce proceedings. As part of the proceedings, petitioner was required to disclose all assets and liabilities. Because petitioner did not have documentation to substantiate his income with respect to his employment with NCPL and the liabilities with respect to the development of the Rivercliff property, on July 27, 2000, Mr. Seki purportedly mailed a letter to Mr. Larson to confirm Mr. Seki's and petitioner's professional relationship, petitioner's income, and the liabilities petitioner had incurred with respect to the Rivercliff property. The July 27, 2000, letter stated:

> Kumi, Ron and I have been friends for many years. Ron and his associates have been extremely helpful to my family over the years. He was personally instrumental in literally saving us from extreme financial hardship at a time when Japan's economy was failing. I am forever indebted to him and his associates for their professionalism and expertise.
>
> After leaving the employment of the Rothschild Banking Group, Ron established a loose business affiliation with Lloyd G. Tupper and Keiji Y. Takahara, entitled "Trans-Pacific Partners." This partnership was later expanded and brought into more formal incorporation and capitalized as a subsidiary of New Century Properties Limited * * * .
>
>     \*    \*    \*    \*    \*    \*    \*
>
> I hereby confirm to you that I am in fact the 100% shareholder and principal (CEO) of the apex company and controlling entity of all business matters Ron is involved in.
>
> Ron is an employee of New Century Properties Limited and is currently salaried at US$9,000 per month (recently increased to adjust for Kumiko's mandatory

temporary "Family Support"--see copy of employment agreement and addendum).  Ron does not receive any compensation from either Trans-Pacific Partners (BVI) Limited, or TPP (HK) Limited.  On occasion we may pay Ron a bonus, but this is not statutory, has no fixed interval or amount and is entirely at my discretion. Accordingly, Ron's salary is determined by myself alone.

       *      *      *      *      *      *      *

It has been our clear understanding that I would finance the construction of Ron & Kumi's facilities at RiverCliff (in accordance with the loan agreement executed on January 25, 1999).  Ron & Kumi would thereupon repay this debt over twenty-years from various funds Ron would earn during that period.

This letter served as Mr. Larson's confirmation of petitioner's representations regarding his income and the liabilities the Talmages incurred with respect to the Rivercliff property.  Mr. Larson never met or spoke with Mr. Seki or anyone else from NCPL.

On November 14, 2000, Mr. Seki purportedly mailed a letter to the Talmages, which stated:

Dear Kumi-san & Ron-san,

Pardon me for writing you in English, but my attorneys have advised me that it is important that this letter be a clear statement to the legal proceedings that have now tragically become the center of your marriage.

       *      *      *      *      *      *      *

I have loaned you two a considerable sum of money to date for the construction of your mutual dream home at RiverCliff Farm.  Further I have offered Ron-san additional funds to be loaned towards a possible financial marital settlement with Kumi-san.  Owing to the fact that Ron-san has told me that Kumi-san rejected Ron-san's settlement offer (presented via Lloyd Tupper), and further, Ron-san's delivery of the message that we now require mortgaged security on our

loan to you was also not responded to by Kumi-san, it is hereby necessary for me to formally put you on notice, in writing, concerning my position on these financial matters.

In accordance with the terms of the Loan we executed with you dated the 25th of January 1999, we hereby exercise our right to formally call for collateral in the form of a First Mortgage on the RiverCliff Farm property.  We require that you do so prior to December 31, 2000.  Further, we hereby formally deliver you notice that henceforth, we make claim against Ron-san's salary.  It is our intention to formally register a lien in Hong Kong to this effect should we not receive sufficient remedy by January 1, 2001.

Should we not receive reasonable progress in this matter of the mortgage, or better yet reconciliation/resolution between the two of you, it is our further intention to file formal suit against you, in the County of Multnomah, State of Oregon come January 2001 to protect our rights as lender.

The Talmages did not grant a security interest in the Rivercliff property before December 31, 2000, and a lien was never filed against petitioner's salary.

On December 11, 2000, SSI filed a construction lien against the Rivercliff property for $246,083 because the Talmages allegedly failed to make timely monthly payments and it was uncertain when payment would be received.  The balance owing was computed as follows:

| | |
|---|---|
| Contract price | $5,525,195 |
| Recording fees | 26 |
| Total | 5,525,221 |
| Less credits and offsets | (5,279,138) |
| Balance due claimant | 246,083 |

The construction lien stated that SSI commenced performance of its contract with the Talmages on April 9, 1998, and "fully

completed the contract on or about November 30, 2000 after which claimant ceased to provide labor, transport or furnish materials or transport, furnish or rent equipment for the improvement". The construction lien was signed by Mr. Schommer and listed petitioner and Kumiko Talmage as the owners of the Rivercliff property.

Although the construction lien stated that the Talmages failed to make timely monthly payments, the record indicates that NCPL made timely payments and made a wire transfer payment of $100,000 on December 8, 2000, 3 days before the construction lien was filed. Further, the construction lien stated that the contract was completed on November 30, 2000. However, the record indicates the development of the Rivercliff property was not completed until January 31, 2005.

Attached to the construction lien was a document titled "Notice Of Claim Lien" stating that SSI "intended to file suit to foreclose the enclosed lien unless payment in full [was] received within ten (10) days of the date of delivery of this notice". NCPL did not make another payment to SSI until March 28, 2001, and SSI never filed suit to foreclose.

Moreover, although the contract was allegedly fulfilled and no payment had been received by SSI, on March 8, 2001, Mr. Schommer wrote a letter to Mr. Tokos, of the Multnomah County Planning Division, requesting additional time (until December 31,

2001) to convert the original dwelling on the Rivercliff property into a storage facility so that petitioner could continue using it as a dwelling until the new home was completed.

In 2000, NCPL wire transferred to SSI a total of $2,742,794 for the development of the Rivercliff property and a total of $38,800 to Kumiko Talmage for petitioner's spousal and child support obligations. Petitioner did not report any of the transferred funds as income on his Form 1040 for 2000 (2000 return).

On December 19, 2000, Mr. Seki purportedly mailed a letter to petitioner's address stating NCPL had lent the Talmages $4,856,172 for the development of the Rivercliff property pursuant to the January 25, 1999, loan agreement.[8]

On January 15, 2001, Mr. Seki purportedly mailed a letter to Kumiko Talmage, which stated:

> Dear Kumiko-san,
>
> I am again writing in follow-up to my notice to you of the 14th of November 2000. As of the date of this letter, I have not yet received any response from you (either directly or via Ronald) regarding my call for security on the very sizable loan I have extended to you and Ronald for your Oregon property. I thus regard your lack of response as a negative and as your having the intent to obstruct my lawful right to security on the said loan.

---

[8] The $4,856,171.94 includes only the amounts NCPL wire transferred to SSI and does not include the $249,193 TPPL wire transferred to SSI in 1998 or any amounts petitioner may have paid SSI directly.

Regretfully therefore I am forced to exercise my right of call on the loan. I will also thus be forced to impound a suitable portion of Ronald's salary from New Century Properties Limited, to be applied as debt service. The good will extended to you in the adjustment on Ronald's salary beginning from May of 2000, thereupon remitting directly to your personal account the sum of US$4,000 monthly-- shall thus beginning from this month, be impounded and directly applied to debt service on the outstanding loan. Accordingly, I shall prohibit Ronald from remitting any of his monthly salary to you for your personal consumption, until such time that you have fulfilled the requirement of providing mortgaged security on the outstanding debt. No further funding will be extended for construction at RiverCliff, or for your marital settlement, until the mortgaged security has been confirmed and your marital conflict is resolved.

It is my understanding you have ample funds available to you anyway, in the form of monies you took from a joint account held by Ronald and yourself, at the time of departure from the family home, last March of 2000. I therefore do not feel you are being at all unjustly treated in this action.

I am to understand Ronald has begun proceedings with the County of Multnomah Family Services department, in attempts to finally be able to communicate with you. I sincerely hope this may work to resolve this very unpleasant situation you have brought upon Ronald, your family, and now reaching to myself and my firm.

Even though Mr. Seki threatened to stop paying petitioner's spousal and child support obligations, Kumiko Talmage did not grant NCPL a security interest in the Rivercliff property and NCPL did not impound petitioner's salary or stop funding the development of the Rivercliff property.

On March 28, 2001, NCPL wire transferred $274,954 to SSI for the development of the Rivercliff property. During 2001, NCPL also wire transferred a total of $45,714 to Kumiko Talmage for

petitioner's spousal and child support obligations. Petitioner did not report any of the transferred funds as income on his Form 1040 for 2001 (2001 return).

On April 11, 2001, petitioner filed his 2000 return with a filing status of head of household, claiming an exemption for his daughter, Lillian Talmage. The 2000 return reported a salary from an "Overseas Employer" of $84,000, interest income of $1,406, a loss of $31,239 on Schedule F, Profit and Loss from Farming, and a child tax credit of $500, with a tax liability of $6,460.[9] Petitioner did not report the portion of his salary used to pay his spousal and child support obligations. The 2000 return also did not claim a deduction for interest paid and did not indicate petitioner's employer was NCPL.

On May 30, 2001, Steven W. Seymour (Mr. Seymour), an attorney hired by B. Manek & Co., a Hong Kong firm of solicitors (solicitors) representing NCPL and/or Mr. Seki, mailed a letter to both Diane E. Rulien (Kumiko Talmage's attorney) and Mr. Larson, stating that NCPL had hired him to perfect a security interest for NCPL in the Rivercliff property. The letter also stated that petitioner and Kumiko Talmage were required to:

> execute a mortgage in favor of my client [NCPL or Mr. Seki] for recording in the real property records of Multnomah County, Oregon. In the event that either, or

---

[9] NCPL transferred $3,980 of petitioner's $9,000 monthly salary to Kumiko Talmage on Aug. 8, Sept. 11, Oct. 10, Nov. 10, and Dec. 15, 2000.

both, parties fail or refuse to execute a mortgage in favor of my client, I have been instructed to commence an appropriate action in Multnomah County Circuit Court to obtain and foreclose its interest in the Property so as to secure its loan to the borrower.

Please advise me, within seven days of the date of this letter, whether your respective client will agree to execute a standard form of real property mortgage in favor of my client. If I do not have such commitment within this time, I will have no alternative but to declare the Loan Agreement in default and commence a lawsuit to enforce my client's rights.

Mr. Seymour never spoke with the solicitors, Mr. Seki, or anyone else from NCPL. On June 1, 2001, Mr. Seymour mailed and faxed a letter to the solicitors stating:

Dear Sir:

I have now had a telephone conference with Mr. Eric Larson, attorney for Mr. Ronald Talmage in the divorce proceeding.

Mr. Larson first asked me whether I would be filing a lawsuit on behalf of New Century Properties Limited. I told him that I was prepared to file a lawsuit if I had to; however, I would prefer that Mrs. Talmage agree to execute the mortgage without the necessity of a lawsuit.

Mr. Larson advised me that the divorce case was set for a settlement conference with the judge next Wednesday, June 6, 2001. He told me that the threat of a lawsuit by New Century Properties Limited would probably help settle this divorce case. He also told me that he hoped that the terms of the settlement would include an award of the Corbett property to his client. If that were to happen, his client would cooperate and sign a mortgage. This would certainly facilitate the resolution of this matter.

Mr. Larson promised to advise me of the results of the settlement conference. I intend to serve Notice of Default of the Loan Agreement terms on Tuesday, June 5, 2001, unless I have agreements from both parties that

they will execute a mortgage. I will then wait to hear from Mr. Larson as to the results of the settlement conference. I will inform you of the same.

In response, on June 4, 2001, the solicitors mailed a letter to Mr. Seymour instructing him to proceed with the title search and prepare to immediately file for foreclosure in the event the June 6, 2001, settlement conference was unsuccessful.

The settlement conference was successful, and Kumiko Talmage agreed to transfer her 50-percent interest in the Rivercliff property to petitioner in exchange for a $1,400,000 promissory note secured by the Rivercliff property. Neither petitioner nor Kumiko Talmage determined the fair market value of the Rivercliff property as part of the divorce proceedings.

On June 20, 2001, the solicitors mailed another letter to Mr. Seymour stating Mr. Seki agreed to accept a trust deed granting NCPL a security interest in the Rivercliff property and agreed that Kumiko Talmage be granted a "1st security" interest of $1,400,000 in the Rivercliff property. The letter also stated that

> In view of the huge outstanding loan and further requirement of US$1,400,000.00 our mutual client anticipate that Mr Talmage may not be in a position to repay the loan. You may therefore consider to include in the Trust Deed default clause (subject to Mrs Talmage US$1,400,000.00 security) to require Mr Talmage to transfer the ownership of the property to our mutual client.

On July 31, 2001, petitioner executed a promissory note for the benefit of NCPL for $4,856,172, which provided:

(a)  Interest on the unpaid principal balance shall be paid annually.  The first interest installment of SIXTY-FOUR THOUSAND TWO HUNDRED THIRTY-SEVEN AND 26/100 ($64,237.26) DOLLARS shall be paid on the 30th day of November, 2001. Subsequent annual interest installments of TWO HUNDRED FIFTY FOUR THOUSAND NINE HUNDRED FORTY NINE THOUSAND AND 02/100 ($254,949.02) DOLLARS shall be paid on the 30th day of November, 2002, and on the same day of each year thereafter until and including the 30th day of November, 2011; and

(b)  On the 30th day of November, 2012, all accrued interest to that date plus SIX HUNDRED SEVEN THOUSAND TWENTY ONE AND 49/100 ($607,021.49) DOLLARS of principal shall be paid, and subsequent payments of accrued interest plus SIX HUNDRED SEVEN THOUSAND TWENTY ONE AND 49/100 ($607,021.49) DOLLARS of principal shall be paid on the same day of each year thereafter through the 30th day of November, 2018; and

(c)  The entire principal balance plus all accrued interest shall be paid in full eighteen (18) years from date hereof, that is, on July 31, 2019.

(d)  All payments hereunder shall be applied first to interest and then to principal.  Interest shall be computed based on a 365-day year.

This Note is secured by a Trust Deed on real property of even date, which real property is situated in Multnomah County.

If any of said installments are not paid within ten (10) days of the date due, or in the event of default hereunder or under the Trust Deed securing this Note, the then unpaid balance of this Note, both principal and interest, shall become immediately due and collectible at the option of the holder of this Note.

The promissory note did not contain a signature line for Kumiko Talmage, and she did not sign it.

On August 20, 2001, the Multnomah County Circuit Court entered a Stipulated Judgment of Dissolution of Marriage; Money

Judgment under which petitioner was required to: (1) Make monthly child support payments of $1,250 until July 2, 2002; (2) place $100,000 in trust for the benefit of Lillian Talmage before December 21, 2001;[10] (3) pay Kumiko Talmage a money judgment of $1,400,000 and execute a first trust deed document encumbering the Rivercliff property to secure payment of the judgment; (4) pay interest on any unpaid portion of the $1,400,000 judgment after December 31, 2001, at a 9-percent per annum simple rate.[11] The stipulated judgment also stated that Kumiko Talmage agreed to a stipulated protective order dated August 8, 2000, requiring her to refrain from discussing the terms and the provisions of the marriage settlement. Kumiko Talmage also agreed to convey her 50-percent interest in the Rivercliff property to petitioner. On August 20, 2001, a bargain and sale deed transferring Kumiko Talmage's 50-percent interest in the Rivercliff property to petitioner was recorded in Multnomah County, Oregon.

On August 21, 2001, petitioner signed a trust deed prepared by Mr. Seymour granting the Rivercliff property to trustee, Chicago Title Insurance Co., to be held for the benefit for NCPL for the purpose of securing payment of $4,856,172 with interest pursuant to the terms of the promissory note.

---

[10] If the $100,000 was not transferred by Dec. 31, 2001, the full amount would accrue interest at a 9-percent rate until paid.

[11] On Feb. 4, 2005, NCPL paid $1,400,000 to Kumiko Talmage to satisfy the judgment against petitioner.

On August 28, 2001, petitioner signed an irrevocable trust agreement promising to transfer $100,000 by December 31, 2001, for the benefit of Lillian Talmage, to provide for her health, education, and support and maintenance during high school, college, and her church mission.

On October 6, 2001, Mr. Seki died of liver cancer, and his wife, Liu Hsiu Chen (Ms. Chen), purportedly became NCPL's CEO.

On April 9, 2002, petitioner filed his 2001 return with a filing status of single. The 2001 return reported a salary from an "Overseas Employer" of only $67,850.[12] The 2001 return also reported a taxable distribution of $3,000 and a Schedule F loss of $9,706, with a tax liability of $7,474. Petitioner's Schedule A, Itemized Deductions, for 2001 reported a real estate tax deduction of $9,545. The 2001 return did not claim a deduction for interest paid or indicate NCPL was petitioner's employer.

On June 8, 2002, petitioner married petitioner Annette C. Talmage.

During 2002, NCPL wire transferred a total of $182,820 to Kumiko Talmage for petitioner's child support obligations and for interest owing on petitioner's settlement obligation to Kumiko Talmage. Petitioner did not report the $182,820 as income on petitioners' jointly filed Form 1040 for 2002 (2002 return).

---

[12] The record indicates that NCPL made only one $4,000 payment to Kumiko Talmage in 2001 (Mar. 9, 2001).

On April 10, 2003, petitioners filed their 2002 joint return and reported a salary from an "Overseas Employer" of $75,000 and a Schedule F loss of $22,875, with a tax liability of $2,501. Petitioner's Schedule A for 2002 reported a real estate tax deduction of $9,545. The 2002 return did not claim a deduction for interest paid.

B.    Respondent's Examination

In late 2003, the Japanese taxing authorities, as part of an information exchange, informed respondent that petitioner, a U.S. citizen, and TPPL were involved in a business transaction in which TPPL received over $5 million in 2000. The Japanese taxing authorities also disclosed documents which stated that petitioner was the CEO and chairman of TPPL and that he resided at the Rivercliff property. While investigating petitioner, Revenue Agents Steve Rans and Christopher Beach discovered the Rivercliff property was titled in the Talmages' names and that SSI was involved in a large construction project on the property.

On January 22, 2004, Agent Rans mailed a letter to petitioner asking whether he held an ownership interest in TPPL or NCPL. The letter referred to documents in which petitioner identified himself as the chairman, the chairman and CEO, and the managing partner and chairman of TPPL. The letter also requested that petitioner disclose the source of funding for the

development of the Rivercliff property and the costs of its development.

In response, by letter dated January 25, 2004, petitioner stated he was employed exclusively by NCPL and at times was temporarily reassigned to work on projects for TPPL and other companies at the direction of his employer.[13] The letter stated that, depending on the transaction, his employer instructed him to use the titles of CEO, chairman, and managing partner. The letter also claimed he did not receive any money from TPPL's transactions and did not have an ownership or controlling interest in NCPL or TPPL. Furthermore, the letter asserted that petitioner was prohibited by NCPL's nondisclosure confidentiality agreement (confidentiality agreement) from providing any documentation or information to the Internal Revenue Service (IRS) with respect to NCPL and TPPL and its owners.

The confidentiality agreement signed by petitioner dated January 10, 1993, states:

> 1. Associate agrees to treat as confidential all technical, business, financial and other confidential or proprietary information of the Company which is disclosed to Associate, whether in written, oral, fax (electronic) or other tangible or intangible form, including without limitation, corporate information, client information, investor information, financial transaction documentation, specifications, know-how, plans, data, other documentation, reports, ideas,

---

[13] At the beginning of respondent's examination, petitioner told the agents he was not authorized to use his employer's actual name.

concepts, and other information (all of the foregoing information hereinafter collectively referred to as the "Information"). The term "Information" shall include all confidential information of the Company, whether disclosed to Associate before, on or after the date hereof. Notwithstanding the foregoing, the term "Information" shall not include information that Associate can demonstrate (a) was known to it prior to its receipt of such information from the Company; (b) became generally publically known other than by Associate's direct or indirect act; (c) was rightfully disclosed to Associate by a third party without restriction; or (d) was independently developed by Associate without use of or access to the Information.

* * * * * * *

5. In the event that Associate or its representatives are requested or required (by questions, interrogatories, requests or information or documents, subpoenas, civil investigation demand court orders or other process) to disclose any Information to a governmental authority or in connection with any litigation, Associate will provide the Company with prompt notice (within one day) of any such request or requirement so that the Company may seek an appropriate protective order. In any event, Associate [shall] cooperate with the Company in obtaining an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Information.

In response to Agent Rans's question with respect to the Rivercliff property, the letter stated that petitioner's employer purchased the property with the Talmages and had owned it jointly with the Talmages. The letter also stated that his employer had assumed loans it made to petitioner which increased the employer's equity in the property. Additionally the letter stated:

Schommer and Sons has been the contractor for all of the facilities I jointly own with my employer here on the Corbett farm [the Rivercliff property]. I own the cottage and an interest in the barn. My employer owns the new house (still under construction) and the tennis court (my wife and I don't even play tennis). These other facilities owned by my employer (NCPL) are for the purpose of company use and various entertainment for my employer and at his discretion.

(1) I do not have a complete figure, as much of the work is still in progress. Also the portion that is my employer's ownership I have not obtained his consent to release financial figures that are not of my personal ownership interest.

(2) Various renovations first began in early 1998 and are still ongoing as directed by my employer.

(3) I funded the cost of the Cottage renovations (our residence) and some work on the barn. My employer had funded the balance and considers all of these as such, his property.

On February 18, 2004, Agent Rans mailed petitioner a Form 4564, Information Document Request, requesting: (1) Petitioner's Federal income tax returns for 2000, 2001, and 2002; (2) copies of all monthly bank statements from December 1, 2000, through January 31, 2002; and (3) records substantiating farm expenses deducted in 2001 and 2002. Respondent also separately requested SSI's bank statements to determine the source of the funding for the development of the Rivercliff property.

Petitioner provided respondent bank statements for two accounts he held with US Bank and for one account he held with Wells Fargo Bank. All three accounts were held in the United States. Petitioner also provided the requested Federal income

tax returns but failed to provide any documentation substantiating the farm expenses deducted in 2001 and 2002.

At a March 17, 2004, meeting between petitioners and Agents Rans and Beach, petitioner reiterated that his employer owned most of the Rivercliff property and that he merely owned the barn and the original dwelling where he resided with his wife, Annette C. Talmage. Petitioner also stated that he was earning an equity interest in the property through the services he provided on the property and the exact respective percentages of ownership would be determined at a future date.

Additionally, during the meeting, petitioner indicated that his employer's name was Mr. Chen[14] and the champion dogs living on the property belonged to his employer. Although the agents requested, petitioner refused to provide his employer's contact information. Petitioner again asserted that pursuant to nondisclosure agreements with NCPL he was not allowed to provide any information about NCPL, TPPL, or his employer.

Shortly after the March 17, 2004, meeting, respondent obtained SSI's bank statements. After reviewing both SSI's and petitioner's bank statements, respondent discovered that NCPL and TPPL wire transferred substantial funds to both SSI and petitioner from bank accounts in Hong Kong. The Hong Kong banks

[14] At trial, petitioner testified that Mr. Chen and Mr. Seki were the same person. However, Mr. Chen/Seki had been deceased since Oct. 6, 2001.

included the Shanghai Banking Corp. at the Harcourt Road branch, the Hong Kong Bank at the Harcourt Road branch, and the CITIC Ka Wah Bank.

On April 2 and 6, 2004, Agent Rans mailed petitioner Forms 4564 requesting: (1) A narrative explanation from petitioner's employer regarding his understanding of his joint ownership in the Rivercliff property and the terms of the loan agreement; (2) a narrative explanation from petitioner's employer stating "why they are currently paying the interest, and ultimately, the principal on the $1,400,000 settlement that you owe to your ex-wife, Kumiko" and why they were paying petitioner's daughter's tuition at BYU; (3) the address, telephone number, and passport number for petitioner's employer, Mr. Chen; (4) an explanation of why NCPL did not have a security interest in the Rivercliff property until after TPPL and NCPL had advanced approximately $5 million; and (5) an explanation of why monthly wire transfers from NCPL to petitioner for petitioner's spousal and child support obligations did not constitute taxable income.

Petitioner did not provide the requested information regarding his employer or his employer's narrative explanation with respect to the joint ownership of the Rivercliff property, the terms of the loan agreement, and the interest payments on the $1,400,000 settlement judgment.

With respect to the questions regarding the Rivercliff property, petitioner asserted that NCPL did not have a security interest in the property until after $5 million had been transferred for its development because the property was zoned only for a single-family residence.  The zoning regulations did not allow the property to be used as a corporate retreat.  Thus, to avoid permit problems with Multnomah County petitioner wanted to maintain the appearance that NCPL did not own an interest and that the property would be used for single-family purposes throughout the course of the permit process and through completion of construction.

With respect to the question regarding NCPL's advances for the interest on the $1,400,000 settlement judgment, petitioner stated:

> I do not consider these payments to my former wife as my personal obligation.  My employer assumed these obligations as his own, in return for her portion of the equity in the [Rivercliff] property.  The payments referred to here are installments towards his acquiring all of her position ultimately.  * * *

With respect to the questions regarding NCPL's payments for petitioner's child support and education, he stated:

> Accordingly, these payments here as well, were not my personal obligation, but what my employer deemed compensation to Kumiko directly.  I personally never received any benefit whatsoever from her receipt of these monies, and therefore do not feel I am obligated to have to pay any taxes on these. * * *

> As to Lillian's portion, I consider these amounts as borrowed funds from my employer, to be settled once we

finish the final retitlement of the [Rivercliff] Property * * *.

After discovering that substantial amounts were wire transferred from NCPL's and TPPL's Hong Kong bank accounts to petitioner's and SSI's bank accounts, on May 24, 2004, Agent Rans mailed petitioner a Form 4564 with two consent directives for petitioner's signature. An attached letter stated:

> Attached are two documents (consent directives) that I would like you to sign and mail back to me. The purpose of the documents is to send to the Hong Kong and Shanghai Bank and the Citic Ka Wa bank in Hong Kong to request records. You have stated that you have no control over those accounts. In that case, the banks would not have the authority to release the requested records to me. This would possibly be one way of verifying that you do not have control over these accounts. Please call me if you have any questions regarding this request.

Respondent was required to obtain consent to acquire the information because the United States and Hong Kong do not have a treaty allowing the IRS to subpoena a U.S. citizen's bank account information from Hong Kong banks.

In response, on May 30, 2004, petitioner mailed a letter stating that he did not have an offshore bank account and his employer prohibited him from signing the consent directives. Petitioner returned the consent directive unsigned.

On September 9, 2004, petitioner and Ms. Chen, on behalf of NCPL, executed a Memorandum of Confirmation and Agreement, which states:

In accordance with the original terms contracted by the late, Tsutomu Seki (former Chairman of NCPL) with regards to employment of Ronald B. Talmage, and specifically the terms of administration and joint development of the property known as RiverCliff Farm * * *, we the undersigned hereby confirm and further agree to the following clarification, further definition and formalization of these relationships:

(1) It is hereby reconfirmed that the original intent of the development of the RiverCliff Farm property was to be a 50/50 joint-venture between Ronald and NCPL, Ronald providing the hands-on and resident administration and some original capital, and NCPL providing required capital thereafter.

(2) Further, it is hereby reconfirmed that in accordance with advice from counsel, it was determined that during the development and construction phase, particularly as it pertains to the regulatory permitting process, that initially Ronald and his spouse would title the property in their name, and as "nominee" for NCPL's portion. It is hereby reconfirmed that in accordance with this process, NCPL capital participation would initially be in the form of debt, but with direct payments to invoices regarding actual construction costs. It is hereby agreed that the intent to this plan was to convert the debt to equity at an appropriate time, as deemed most suitable to the regulatory environment, phase of completion of the project and any other extenuating circumstances that might trigger this conversion to equity.

(3) Further, Ronald has since undergone challenges with divorce and the resulting exposure of confidential matters and more recently even resulting in audit by the IRS.

(4) Accordingly of recent, counsel has advised the parties that the current regulatory environment within the Columbia River Gorge National Scenic Area, and more particularly the Land Use Planning Department of Multnomah County, has been greatly eased as compared to the conditions at the time of initiation of development at the RiverCliff Farm property.

(5) The undersigned have therefore determined that it is now advisable to proceed to exercise the NCPL right of conversion to equity and formalization of the title position

for NCPL participation in the direct ownership of the RiverCliff Farm property.

(6) Further, possible tax questions have been raised by the IRS concerning Ronald's position in the subject property and settlement of his divorce and relations to his former spouse's (former) equity position in the RiverCliff Farm property.

(7) We the undersigned therefore intended to proceed with necessary documentation to resolve the above issues and convert title as most suitable, including but not limited to the following points:

(a) NCPL will purchase Ronald's former spouse, Kumiko's (former) equity position, by directly paying off her remaining obligation. NCPL will consider the sum total of any and all interest and principal payments on the divorce settlement amount as a purchase or swap for equity in the RiverCliff Farm property.

(b) NCPL will also purchase a portion of Ronald's equity in the RiverCliff Farm property, by paying the balance due on Lillian Talmage's trust settlement, and likewise consider any and all interest and principal payments in this regard as a purchase or swap of equity for payment.

(c) Ronald shall simultaneous to this, transfer title ownership in the RiverCliff property, to NCPL, to be duly recorded accordingly.

(d) Ronald shall engage necessary Counsel to effect these matters properly, legally and tax efficiently

(e) NCPL shall carry costs of such advisory, proceedings and recordations, and shall make direct remittance to appropriate parties as needed.

(f) Following advice from Counsel, Ronald and NCPL shall arrive at a suitable number or portion to designate Ronald's remaining equity in the Rivercliff Farm property. Such position can thereupon be formalized by appropriate arrangements such as a "Limited Partner" position and/or a contractual arrangement as advised by Counsel.

(g) As a principal, the undersigned hereby agree that in keeping with the original intent of the 50/50 joint-venture for the ownership and development of the RiverCliff Farm property--that Ronald should be left with a minimum a perpetual use of the RiverCliff Farm property, at least through the duration of his life.  It is the desire of NCPL to have Ronald act as the resident manager of the RiverCliff Farm property, and as such NCPL pledges to provide Ronald and his spouse Annette, with residence there as long as he remains in the employ or affiliated with NCPL.

(h) The precise "formula" for this continuing joint-venture and employer-employee arrangement with regards to the RiverCliff Farm property, shall be driven by advice from Counsel as to the best possible solution for all of the above issues.

(i) It is the intent of NCPL to make regular use of the RiverCliff Farm property for company, NCPL shareholder and corporate client recreation and conference purposes.  Further, NCPL officers and shareholders intend to place various items of ownership (i.e., horses, dogs, vehicles, art pieces etc.) on the premises, for enjoyment by it's officers and associates from time to time.

(j) It is the intent of NCPL and Ronald, that Ronald will remain in the employ of NCPL and Ronald will continue to advise NCPL on various business and asset management matters as per to date, and as new opportunities present themselves in the future.

(k) It is agreed that this process of title transfer and formalization of the above arrangements shall be accomplished in conjunction with the requirements of payment of the remaining obligation to Ronald's former spouse Kumiko, with all necessary documentation and due process accomplished no later than the 31st of January 2005.

(l) It is agreed that various contracts, notices, filings and recordations will be part of this formalization process, and both NCPL and Ronald agree to cooperate in the completion of any and all required.

(8) Ronald shall herewith proceed to make arrangements with Counsel and to notify appropriate parties to begin this process, and notify NCPL accordingly. * * *

C.   Events After Issuance of Notices of Deficiency

The notices of deficiency for 1998, 1999, 2000, 2001, and 2002 were issued on April 11, 2005.

On June 17, 2005, NCPL incorporated RiverCliff Farm, Inc. (RFI), as a solely owned subsidiary under the laws of the State of Oregon for the purpose of operating a vacation home for NCPL. Ms. Chen was named the president and petitioner was named the secretary of RFI.  The articles of incorporation for RFI list Robert G. Burt, P.C., as the registered agent, and Robert G. Burt, Attorney at Law, as the incorporator.

Although the appraised fair market value of the Rivercliff property was only $5,670,000 as of June 30, 2005, petitioner transferred title, by quitclaim deed, to RFI for $12,608,786 on June 30, 2005.[15]  The $12,608,786 comprised $6,869 in cash, a $3,528,068 promissory note, forgiveness of the $519,033 NCPL advanced to petitioner to purchase the Rivercliff property, and other advanced funds totaling $8,554,816.[16]

---

[15] According to an appraisal prepared by Matthew P. Call of PGP Valuation, Inc., for petitioner's attorney, Robert G. Burt, the Rivercliff property had a fair market value of $5,670,000 as of June 30, 2005.

[16] NCPL purportedly assigned the $519,033 and $8,554,816 to RFI as receivables.

The $8,554,816 comprised:  (1) The wire transfer of $249,193 from TPPL to SSI in 1998 for the development of the Rivercliff property and the wire transfers of $2,109,464, $2,746,708, and $274,953 from NCPL to SSI in 1999, 2000, and 2001, respectively, for the development of the Rivercliff property; (2) wire transfers of $36,263, $13,454, and $42,553 from NCPL to petitioner in 1998, 2001, and 2002, respectively; and (3) wire transfers from NCPL to petitioner totaling $3,082,228 for various other Rivercliff property development costs not at issue in this case.

After the Rivercliff property was transferred to RFI, petitioner purportedly offset the funds NCPL wire transferred to Kumiko Talmage to pay petitioner's spousal and child support obligations and divorce settlement obligations against the $3,528,068 promissory note from RFI.[17]

On June 30, 2005, NCPL transferred its purported interest in the Rivercliff property to RFI by quitclaim deed.  The quitclaim deed did not specify the interest NCPL held in the Rivercliff property or the exact consideration paid by RFI.  The quitclaim deed stated "Other property or value was paid [as] consideration for this conveyance".

_____

[17] As of June 30, 2005, NCPL had wire transferred $2,095,203 to Kumiko and Lillian Talmage for the amounts petitioner owed under the divorce settlement and for his spousal and child support obligations.

On June 30, 2005, petitioners both signed an employment agreement with RFI to work as the Rivercliff property's caretakers, in which their duties included supervising the completion of the Rivercliff property development, maintaining the new home for corporate guests, operating the farm, and caring for their employer's dogs and horses. The dogs and horses had been transferred to RFI by the Talmages by bill of sale. For their services, petitioner and Annette C. Talmage were paid annual salaries of $42,000 and $12,000, respectively, and were granted full use of the Rivercliff property and permitted to reside in the property's newly completed home.

On July 1, 2005, RFI contracted with SSI to complete the development of the Rivercliff property development. SSI was paid a total of approximately $12,500,000 to develop the Rivercliff property from 1998 through January 31, 2006.

Petitioners filed their petition on July 12, 2005.

On March 3, 2006, petitioners jointly filed their Form 1040 for 2005, in which they reported $2,960,851 in capital gains from the sale of the Rivercliff property to RFI. On November 16, 2006, petitioners filed Form 1040X, Amended U.S. Individual Income Tax Return, in which they reduced the capital gain recognized on the sale of the Rivercliff property to $2,322,720.

OPINION

I.  An Overview

The record in this case presents testimony and documentary evidence so internally inconsistent and implausible on its face that we cannot credit it.  Petitioner and Ms. Chen were petitioners' primary witnesses.

Throughout the examination phase of this case, pretrial preparation, and the subsequent trial, petitioner sought to limit his testimony and evidence by claiming that confidentiality agreements with respect to his employment and a protective order entered by Multnomah County Circuit Court in the divorce case with Kumiko Talmage required him to do so.

The stipulated protective order agreed to by petitioner and Kumiko Talmage prohibited disclosure of any documents and testimony in the divorce case file in perpetuity.  We have previously denied petitioner's motion in limine for exclusion of documents and testimony in the divorce case.  The protective order was not issued by the Multnomah County Circuit Court to resolve a controversy but simply to approve the parties' stipulated agreement, and petitioner and Kumiko Talmage were material witnesses in this case.  See Melea Ltd. v. Commissioner, 118 T.C. 218, 223-226 (2002).

The confidentiality agreement dated January 10, 1993, is the only such agreement introduced into the record.  The

confidentiality agreement, contrary to petitioner's assertions, does not prohibit disclosure of information pertaining to petitioner but requires only that the employer be notified of any inquiry so that it might seek protection against disclosure of employer information not related to petitioner.

At trial petitioner testified that NCPL was owned by Mr. Seki and that he was employed by Mr. Seki. The only corroborating evidence of petitioner's assertions are letters written in English signed by Mr. Seki. Mr. Seki could not read or write English. Kumiko Talmage testified that Mr. Seki worked for petitioner. The record is devoid of any corporate documentation including stock certificates, corporate minutes, or public filings (other than the articles of incorporation for NCPL, which do not disclose ownership) supporting petitioner's assertions. Moreover, the record as a whole supports the inference that funds would be transferred when requested by petitioner with no real limitation as to the amounts.

Petitioner introduced confirmatory memoranda created long after transactions had occurred in an attempt to characterize previous transactions in a manner inconsistent with facts. The documentation relative to loans will be discussed shortly. Other documentation prepared by, or at the direction of, petitioner, has been represented by him to originate from others, including the June 16, 2000, letter signed by Mr. Seki and an officer's

certificate of Liu Hsiu Chen dated November 21, 2006, signed by Ms. Chen.

Petitioner, through contradictory testimony and evidence, has represented his ownership interest in the Rivercliff property to be: (1) Outright joint ownership with his wife, Kumiko; (2) outright ownership of only the original farm dwelling and barn; (3) 50-50 ownership with his purported employer; or (4) ownership by his purported employer with petitioner able to work into an equity position for services rendered. In spite of all of the contradictory representations, petitioner held legal title to the Rivercliff property jointly with Kumiko Talmage until August 20, 2001, when she deeded her ownership interest to petitioner. Petitioner held sole legal title until June 30, 2005, when he transferred title to RFI. Moreover, petitioner continuously resided in and used the Rivercliff property as his primary residence from 1999 through the date of trial.

Petitioner's testimony relating to the payments by his purported employer to Kumiko Talmage arising from the divorce is inconsistent and implausible. Petitioner categorized the payments variously as: (1) Advances due to friendship; (2) obligations assumed by his employer and therefore no longer his; (3) payments by NCPL to acquire Kumiko Talmage's 50-percent ownership interest in the Rivercliff property (despite the fact that Kumiko Talmage transferred her interest in the Rivercliff property to petitioner

as part of the divorce settlement); and (4) loans.  In view of the compensation petitioner earned, to suggest that an employer would advance funds in excess of $2 million to an employee to satisfy an employee's divorce obligations is beyond implausible.

We must determine the credibility of a witness on the basis of objective facts, the reasonableness of the testimony, and the demeanor of the witness.  Quock Ting v. United States, 140 U.S. 417, 420-421 (1891); Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Dozier v. Commissioner, T.C. Memo. 2000-255.  Petitioner's testimony was inconsistent, contradictory, implausible, and not credible.

Ms. Chen is of Chinese ancestry and resides in Taiwan.  She cannot read or write English and testified through an interpreter.[18]  Ms. Chen's testimony, even giving due regard to the language barrier, revealed a lack of basic knowledge about her business relationship with petitioner.  She testified that she had been the CEO of NCPL since her husband, Mr. Seki, died on October 6, 2001, and that NCPL had only two employees, Susan Lung and petitioner.  Although she was allegedly the CEO of NCPL, a company with only two employees, she did not know what petitioner's salary

---

[18] Ms. Chen's attorney, Philip N. Jones, explained to the Court that it was "very difficult or impossible for her to tell what a document is about because of the language barrier".  He also stated that "the language barrier for my client is quite severe, and when she is handed a document in English, it's as if I was handed a document printed in Chinese characters.  She cannot read it."

was, who determined it, or how it was determined. Her testimony with respect to the purported loans by NCPL to petitioner conflicted, in part, with other evidence.[19] Additionally, she was unable to recall who drafted her Officer's Certificate dated November 21, 2006, but when pressed on cross-examination, admitted receiving the document from petitioner. Ms. Chen provided no books or records from NCPL to substantiate any of her testimony, and the only documents bearing her signature were documents written in English.

Ms. Chen attempted to avoid answering questions directly put to her, she lacked basic knowledge about NCPL and its relationship to petitioner, and her demeanor at trial led the Court to believe she would sign any document placed before her by petitioner. Therefore, the Court finds that her testimony was not credible.

II. <u>The Purported Loans</u>

Respondent contends petitioner failed to report the following wire transfers as income:

---

[19] Ms. Chen testified that the amounts advanced for the divorce and the improvements on the Rivercliff property were $80,000 and $550,000 respectively. Her testimony with regard to the $510,000 to $520,000 advanced to purchase the Rivercliff property was accurate.

- 53 -

| Tax year | Wire transfer to purchase Rivercliff | Wire transfers to SSI for the development of Rivercliff[1] | Wire transfers to operate the Rivercliff farm[2] | Wire transfers for family support obligations[3] |
|---|---|---|---|---|
| 1998 | $519,033 | $249,193 | $36,263 | -0- |
| 1999 | -- | 2,109,464 | -0- | -0- |
| 2000 | -- | 2,746,708 | -0- | $12,000 |
| 2001 | -- | 274,953 | 13,454 | 8,670 |
| 2002 | -- | -0- | 42,533 | 181,765 |
| Total | 519,033 | 5,380,318 | 92,250 | 202,435 |

[1] The wire transfer to SSI in 1998 of $249,193 for the development of the Rivercliff property was from TPPL.  The wire transfers for the development of the Rivercliff property in 1999, 2000, and 2001 were from NCPL.

[2] Using the bank deposits method to reconstruct petitioner's income, respondent found that petitioner failed to report income of $36,263, $13,454, and $42,553 in 1998, 2001, and 2002, respectively.  Petitioner asserted these amounts were loans for the operation of the farm on the Rivercliff property.

[3] Petitioner's family support obligations include the total amounts NCPL wire transferred to petitioner for his spousal and child support obligations in 2000, 2001, and 2002 and for the interest paid on the $1,400,000 divorce settlement in 2002.

Petitioner does not dispute the amounts of the wire transfers but contends the transferred funds comprised three nontaxable loans for:  (1) The purchase of the Rivercliff property; (2) the development of the Rivercliff property and the operation of the farm on the property; and (3) petitioner's spousal and child support obligations and the interest paid on the $1,400,000 divorce settlement (petitioner's family support obligations).

Petitioner has the burden to prove the transferred funds constituted loans.  See Rule 142(a).[20]

A loan is "'an agreement, either expressed or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree.'"  Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000) (quoting Commissioner v. Valley Morris Plan, 305 F.2d 610, 618 (9th Cir. 1962), revg. 33 T.C. 572 (1959) and 33 T.C. 720 (1960)), affg. T.C. Memo. 1998-121.  Because receipt of money pursuant to a loan is offset by a corresponding obligation to repay, a loan is not taxable income.  Commissioner v. Tufts, 461 U.S. 300, 307 (1983).

For a bona fide loan to arise both parties must have had an actual intent to establish a debtor-creditor relationship at the time the funds were advanced.  Estate of Chism v. Commissioner, 322 F.2d 956, 960 (9th Cir. 1963), affg. Chism Ice Cream Co. v. Commissioner, T.C. Memo. 1962-6; Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970).  Whether the parties intended to establish a debtor-creditor relationship is determined by the facts and circumstances.  Fisher v. Commissioner, supra at 910.  The U.S.

---

[20] The burden of proof does not shift to respondent in this case pursuant to sec. 7491(a) because petitioner failed to:  (1) Comply with the requirements under the Code to properly substantiate items; (2) show he maintained all required records; and (3) show he cooperated with the reasonable requests of respondent for documents and information.

Court of Appeals for the Ninth Circuit considers seven factors to determine whether a debtor-creditor relationship existed, with no single factor being determinative.[21]  Welch v. Commissioner, supra at 1230.  The factors are:  (1) Whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayment was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction was a loan. Id.

The Court will address the purported loans separately beginning with the loans for the development and operation of the Rivercliff property, followed by the loans for the purchase of the Rivercliff property and the loans for petitioner's family support obligations.

    A.   The Rivercliff Property Development and Operating Loans

        1.   Whether the Promise To Repay Was Evidenced by a Note or Other Instrument

A note or other instrument is indicative of a debtor-creditor relationship.  Teymourian v. Commissioner, T.C. Memo. 2005-232.

---

[21] Because petitioner resides in the State of Oregon, absent stipulation otherwise, an appeal of this case would go to the U.S. Court of Appeals for the Ninth Circuit.  See sec. 7482(b)(1)(A).

However, an instrument will be given little weight when the form of the instrument fails to correspond with the substance of the transaction. Provost v. Commissioner, T.C. Memo. 2000-177.

Petitioner did not produce a note or other instrument indicating he intended to repay TPPL the $249,193 it transferred to SSI in 1998 for the development of the Rivercliff property or repay NCPL for the total of $92,250 it transferred to petitioner for the Rivercliff property's farm operating expenses in 1998, 2001, and 2002.

However, petitioner asserts that the January 25, 1999, loan agreement and the July 31, 2001, promissory note prove he and NCPL established a debtor-creditor relationship with respect to the funds NCPL wire transferred to SSI for the development of the Rivercliff property in 1999, 2000, and 2001.[22]

The record reflects that neither petitioner nor NCPL adhered to the terms of the loan agreement or the promissory note: (1) Petitioner did not make a payment by January 25, 2004, as required under the loan agreement; (2) petitioner did not make the $64,237 payment due on November 30, 2001, or the $254,949 payments due on November 30 each year thereafter as required under the promissory note; (3) NCPL did not attempt to collect the full amount owing or

_____

[22] The documentation created during the period of the divorce proceedings from June 1, 2000, to Aug. 1, 2001, is given little weight. It is obvious that petitioner was seeking by means of preparation of documents and other manipulations to limit his financial exposure in the divorce case.

any portion thereof after each default; and (4) petitioner did not have the financial ability to repay the funds wire transferred by NCPL to SSI.  Petitioner reported earning a modest income of only $58,736, $76,560, $84,000, $67,850, $75,000, $52,059, $49,866 in 1998, 1999, 2000, 2001, 2002, 2003, and 2004, respectively.

Furthermore, contrary to the loan agreement and the promissory note, the September 9, 2004, memorandum of confirmation stated that petitioner and NCPL formed a joint venture to develop the Rivercliff property, the Talmages' names on the Rivercliff property's title indicated that they served as nominees for NCPL's ownership interest, and at a future date petitioner planned to convert NCPL's advances into an ownership interest.  Also contrary to the loan agreement and the promissory note, petitioner repeatedly testified that until the characterization of the wire transfer advances was fixed by him and NCPL, he was not required and did not intend to make any payments on the advanced funds. Petitioner testified that he and NCPL officially characterized NCPL's advances to SSI as a loan on June 30, 2005, when he transferred the Rivercliff property to RFI as repayment for NCPL's advances.

For the foregoing reasons, the Court finds that neither petitioner nor NCPL intended to comply with the terms of the loan agreement or the promissory note.  Thus, the Court gives the loan agreement and the promissory note little weight.

## 2.   Whether Collateral Was Given To Secure Payment

The January 25, 1999, loan agreement stated that "security for the loaned funds shall be in the form of, firstly, a lien on Ronald's salary as paid by NCPL, and secondly, at an appropriate time, a mortgage or lien on the property."[23]

Although petitioner asserts his salary served as collateral to secure payment of the funds advanced to SSI for the development of the Rivercliff property, the salary was not enough to secure a loan of $4,856,172.  Additionally, NCPL did not garnish petitioner's wages when he failed to make the payments required by the loan agreement and the promissory note.

Petitioner asserted that the Rivercliff property also served as collateral to secure payment.  However, the trust deed securing NCPL's advances to SSI of $4,856,172 was not executed until August 21, 2001, after the funds secured by the property were advanced. For a bona fide loan to arise the parties must have so intended at the time the funds were advanced.  Estate of Chism v. Commissioner, 322 F.2d at 960; Fisher v. Commissioner, 54 T.C. at 909-910.

Petitioner testified that because Kumiko Talmage refused to sign any document encumbering the Rivercliff property, he was unable to grant a security interest until after she transferred

---

[23] The June 16, 2000, loan confirmation agreement also requested petitioner record a mortgage in favor of NCPL.

him her interest. Kumiko Talmage credibly testified that, before the divorce proceedings, she had never heard of NCPL, was not aware petitioner had borrowed any money to develop the Rivercliff property, and was not asked to sign an agreement granting a security interest in the Rivercliff property.

In addition, petitioner produced no evidence indicating collateral was given to secure payment of the $249,193 TPPL transferred to SSI in 1998 for the development of the Rivercliff property or the total of $92,250 NCPL transferred to petitioner for the Rivercliff property's farm operating expenses in 1998, 2001, and 2002.

This factor indicates the parties did not intend to establish a debtor-creditor relationship at the time the funds were advanced.

### 3. Whether a Fixed Schedule for Repayments Was Established

A fixed schedule for repayment is indicative of a bona fide loan. Welch v. Commissioner, 204 F.3d at 1231; Teymourian v. Commissioner, T.C. Memo. 2005-232. Evidence that a creditor did not intend to enforce payment or was indifferent as to the exact time an advance was repaid indicates a bona fide loan did not exist. Gooding Amusement Co. v. Commissioner, 23 T.C. 408, 418-419 (1954), affd. 236 F.2d 159 (6th Cir. 1956); Provost v. Commissioner, T.C. Memo. 2000-177.

The promissory note set forth a fixed schedule for repayment with a default provision requiring immediate payment of both principal and interest. However, the record indicates petitioner did not make any payments to NCPL and NCPL never attempted to collect the amount owing after each default. Petitioner testified that NCPL did not require him to comply with any fixed terms or require him to make any payments until the characterization of the advances was determined.

Furthermore, petitioner produced no documentation showing that a fixed schedule was established to repay the $249,193 TPPL transferred to SSI in 1998 for the development of the Rivercliff property or the total of $92,250 NCPL transferred to petitioner for the Rivercliff property's farm operating expenses in 1998, 2001, and 2002.

This factor indicates the parties did not intend to establish a debtor-creditor relationship at the time the funds were advanced.

4.  Whether the Borrower Had a Reasonable Prospect of Repaying the Loan and Whether the Lender Had Sufficient Funds To Advance the Loan

This factor is best determined by looking to whether there was "a reasonable expectation of repayment in light of the economic realities of the situation" at the time the funds were advanced. Fisher v. Commissioner, supra at 910. A reasonable prospect of repayment at the time the funds were advanced

indicates the existence of a bona fide loan.  Welch v. Commissioner, supra at 1231.  A bona fide loan is not indicated when a taxpayer is financially unable to repay advanced funds at the time they are given.  Estate of Taschler v. United States, 440 F.2d 72, 76 (3d Cir. 1971); Commissioner v. Makransky, 321 F.2d 598, 600 (3d Cir. 1963), affg. 36 T.C. 446 (1961).

During 1998, 1999, 2000, 2001, and 2002, petitioner, directly or indirectly through SSI, was advanced $6,194,036 for the purchase, development, and operation of the Rivercliff property and for family support obligations while allegedly earning only $58,736, $76,560, $84,000, $67,850, and $75,000 in 1998, 1999, 2000, 2001, and 2002, respectively.  Petitioner did not produce any documentation indicating he had other assets, other sources of income, or any prospective means of repaying the large sums of money he was advanced.  See Commissioner v. Makransky, supra at 600-601.

Therefore, it was unreasonable to expect at the time the funds were advanced that he could repay them.  This factor indicates the parties did not intend to establish a debtor-creditor relationship at the time the funds were advanced.

### 5.  Whether Interest Was Charged

The payment of interest indicates the existence of a bona fide loan.  Welch v. Commissioner, supra at 1231; Teymourian v. Commissioner, supra; Morrison v. Commissioner, T.C. Memo. 2005-53.

The record is devoid of any evidence that interest was paid on any of the advanced funds at any time, including when petitioner transferred the Rivercliff property to RFI.

This factor indicates the parties did not intend to establish a debtor-creditor relationship at the time the funds were advanced.  See Calumet Indus, Inc. v. Commissioner, 95 T.C. 257, 287 (1990).

### 6.    Whether Repayments Were Made

Repayment is an indication that an advance was intended as a loan.  Welch v. Commissioner, supra at 1231; Pierce v. Commissioner, 61 T.C. 424, 431 (1974); Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970). Repayments must be bona fide.  Crowley v. Commissioner, 962 F.2d 1077, 1083 (1st Cir. 1992), affg. T.C. Memo. 1990-636.

Petitioner contends that the transfer of the Rivercliff property to RFI constituted repayment of his outstanding loans. However, petitioner testified that he did not intend to repay the funds wire transferred to SSI or him until the character of the advances could be determined.  He also did not have a present or prospective means of repaying the advanced funds.  The transfer of the Rivercliff property to RFI after the notices of deficiency were issued was directed to an effort to give the funds that had been advanced a character which they did not have when they were advanced.  See Estate of Taschler v. United States, supra at 76.

Therefore, petitioner's transfer of the Rivercliff property to RFI in June 30, 2005, was not a bona fide repayment.  See Commissioner v. Makransky, supra at 600-601.

This factor indicates the parties did not intend to establish a debtor-creditor relationship at the time the funds were advanced.

   7.   Whether the Parties Conducted Themselves As If the Transaction Were a Loan

The conduct of the parties may indicate the existence of a loan.  Baird v. Commissioner, 25 T.C. 387, 395 (1955); Teymourian v. Commissioner, T.C. Memo. 2005-232; Morrison v. Commissioner, supra.

Petitioner produced no evidence showing TPPL and petitioner conducted themselves in a manner indicating that TPPL's transfer of $249,143 to SSI in 1998 was a loan.  Petitioner also failed to produce evidence showing NCPL and petitioner conducted themselves in a manner indicating the total of $92,250 NCPL transferred to petitioner for the Rivercliff property's farm operating expenses in 1998, 2001, and 2002 was a loan.

Although petitioner executed a loan agreement, a promissory note, and a trust deed indicating the funds transferred to SSI for the development of the Rivercliff property in 1999, 2000, and 2001 were a loan, neither party abided by the terms of the loan agreement, the promissory note, or the trust deed.

Petitioner's statements regarding the character of the advances were inconsistent.  During respondent's examination, petitioner told respondent's agents he owned only a small percentage of the Rivercliff property and NCPL's transfers of funds to SSI were for NCPL's ownership interest in the property, not his.  Petitioner also testified that as of March 2004, he and NCPL were still negotiating whether to characterize the advanced funds as NCPL's ownership interest in the Rivercliff property or as a loan to petitioner.  Despite all transfers of title to the Rivercliff property, petitioner has continued to enjoy full use and benefit of the Rivercliff property including residing in the new residence.

This factor indicates the parties did not intend to establish a debtor-creditor relationship at the time the funds were advanced.

### 8.  Conclusion

Petitioner failed to meet his burden of proving that the $5,380,318 transferred to SSI for the development of the Rivercliff property and the $92,250 NCPL transferred to petitioner for the Rivercliff farm operating expenses constituted bona fide loans.  On this record, the Court finds that petitioner failed to report as income the funds transferred by TPPL to SSI of $249,193 in 1998, the funds transferred by NCPL to SSI of $2,109,464, $2,746,708, and $274,953 in 1999, 2000, and 2001, respectively,

and the funds transferred by NCPL to petitioner to operate the Rivercliff property's farm of $36,263, $13,454, and $42,533 in 1998, 2001, and 2002, respectively.

B.    The Rivercliff Property Purchase Loan

With respect to the $519,033 NCPL advanced to petitioner for the purchase of the Rivercliff property in 1998, the record discloses that:  (1) No promissory note or other instrument was executed; (2) no collateral was pledged to secure repayment; (3) there was no fixed schedule for repayment; (4) as determined above, it was not reasonable to expect at the time the funds were advanced petitioner could repay them; (5) no interest was charged or paid; (6) and petitioner did not intend at the time the funds were advanced to make any payments.

At trial petitioner testified that because of his long and close relationship with Mr. Seki, formalities were not required and the form of repayment was left open until the Rivercliff property was completely developed.  However, this does not demonstrate that petitioner and NCPL conducted themselves in a manner indicating the $519,033 advance was a loan.

Petitioner has failed to meet his burden of proving that the $519,033 advanced to him for the purchase of the Rivercliff property constituted a bona fide loan.  On this record, the Court finds that petitioner failed to report the $519,033 as income in 1998.

C.    Loans for Petitioner's Family Support Obligations

Petitioner contends that NCPL lent him $12,000, $8,760, and $181,765 in 2000, 2001, 2002, respectively, to pay his spousal and child support obligations and the interest owing on the $1,400,000 divorce settlement.

With respect to this purported loan, the record discloses: (1) No promissory note or other instrument was executed; (2) no collateral was pledged to secure repayment; (4) there was no fixed schedule for repayment; (4) as determined above, it was not reasonable to expect at the time the funds were advanced petitioner could repay them; (5) no interest was charged or paid; and (6) petitioner did not intend at the time the funds were advanced to make any payments.

Petitioner testified that his employer paid his family support obligations because the divorce was a very difficult time in petitioner's life.  According to petitioner, his employer assured him that he could pay the money back at an "appropriate time in the future".  Petitioner had previously written in response to Agents Rans's inquiries that the family support obligations were paid by NCPL to purchase Kumiko Talmage's equity in the Rivercliff property.

Petitioner has failed to meet his burden of proving that the funds advanced for his family support obligations of $12,000, $8,760, and $181,765 in 2000, 2001, 2002, respectively,

constituted bona fide loans. On this record, the Court finds that petitioner failed to report these amounts as income in the respective years.

III. Whether Petitioner Failed To Report Gains From the Sale of the Rental Property in Vancouver, Washington, and the Vacation Home in Black Butte, Oregon

A. Background

Section 61(a)(3) defines gross income for purposes of calculating taxable income as all income from whatever source derived, including gains derived from dealings in property. Section 1 imposes a tax on individuals for taxable income received.[24]

From the time the Vancouver and Black Butte properties were purchased in 1990 through the year of sale, 1998, the Talmages resided in Japan. At trial, petitioner testified that the loans used to purchase the Vancouver and Black Butte properties were in his and Kumiko Talmage's names and the properties were titled in both their names. Kumiko Talmage testified she and petitioner had equal ownership interests in both properties. On brief, petitioner stated both he and Kumiko Talmage signed the closing documents when each property was sold. Third-party payor information reported that petitioner was paid the proceeds from the sale of each property. Additionally, the proceeds from the

---

[24] Neither party asserted that the Vancouver or the Black Butte property was community property.

sale of each property were used for the Talmages' personal expenses and to develop the Rivercliff property.

The Court finds respondent established the requisite evidentiary foundation connecting petitioner and Kumiko Talmage with the receipt of the proceeds from the sale of both the Vancouver and Black Butte properties in 1998.  See Edwards v. Commissioner, 680 F.2d 1268, 1270 (9th Cir. 1982); Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), revg. 67 T.C. 672 (1977); Petzoldt v. Commissioner, 92 T.C. 661, 689 (1989); McManus v. Commissioner, T.C. Memo. 2006-68.

B.   Vancouver Property

Petitioner contends that Kumiko Talmage was the sole owner of the Vancouver property because he was opposed to purchasing the property, he was not involved in leasing the property, and he did not report income earned or claim losses incurred from leasing the property.  Thus, petitioner asserts he was not required to report any of the $31,231 gain from the sale of the Vancouver property on his 1998 return.[25]

Petitioner's own testimony and the record clearly show petitioner and Kumiko Talmage owned the Vancouver property jointly, and they recognized $31,231 of gain on its sale. Petitioner was not a credible witness, and outside of his self-

_____

[25] Petitioner filed his 1998 return as married filing separately.

serving testimony he produced no evidence indicating Kumiko Talmage was the sole owner.  The fact that petitioner failed to report the income earned or claim losses incurred from leasing the property does not prove lack of ownership.

For the foregoing reasons, the Court finds that petitioner owned a 50-percent interest in the Vancouver property.  Accordingly, petitioner was required to report $15,616 of long-term capital gain upon the sale of the property in 1998.  <u>Blair v. Commissioner</u>, 300 U.S. 5, 12-14 (1937) (Federal income tax liability follows ownership); <u>Salvatore v. Commissioner</u>, T.C. Memo. 1970-30, affd. 434 F.2d 600 (2d Cir. 1970).

C.  <u>Black Butte Property</u>

Petitioner also contends he was required to report only $60,303 of the $120,606 gain from the sale of the Black Butte property in 1998 because he owned only 50 percent of the property.

As with the Vancouver property, the Court finds that petitioner owned a 50-percent interest in the Black Butte property.  Therefore, he recognized $60,303 upon the sale of the property in 1998.

IV.  Whether Petitioner Is Entitled to the Full Amount of the Foreign Earned Income Exclusion for 1999

     A.  The Period in Which Petitioner Was a Qualified Individual

Petitioner contends he is entitled to the full amount of the foreign earned income exclusion pursuant to section 911(a) for 1999.

Section 911(a) provides, in part, that a "qualified individual" may elect to exclude from gross income his or her "foreign earned income".  Section 911(b)(1)(A) defines the term "foreign earned income" as amounts received by an individual from sources within a foreign country which constitute earned income attributable to services performed by such individual during the period described in subparagraph (A) or (B) of subsection (d)(1). See Harrington v. Commissioner, 93 T.C. 297, 303-304 (1989).

Section 911(d)(1) establishes requirements a taxpayer must meet in order to be considered a qualified individual for purposes of section 911(a).[26]  First, the taxpayer's "tax home" must have

_____

[26] Sec. 911(d)(1) defines the term "qualified individual" as follows:

     (1) * * * The term "qualified individual" means an individual whose tax home is in a foreign country and who is--
          (A) a citizen of the United States and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or

(continued...)

been in a foreign country during the year at issue.  Sec.
911(d)(1).  Second, the taxpayer must have either been a bona fide
resident of a foreign country for an uninterrupted period which
includes an entire taxable year (the "bona fide residence" test)
or the taxpayer must have been physically present in a foreign
country for 330 days during a consecutive 12-month period (the
"physical presence" test).[27]  Sec. 911(d)(1)(A) and (B); sec.
1.911-2(c) and (d), Income Tax Regs.

With respect to the first requirement, section 911(d)(3)
provides that a taxpayer's "tax home" is his home for purposes of
section 162(a)(2) (relating to traveling expenses while away from
home).  Generally, a taxpayer's "tax home" for purposes of section
162(a)(2) is the taxpayer's principal place of business.
Harrington v. Commissioner, supra at 307; Mitchell v.
Commissioner, 74 T.C. 578, 581 (1980); sec. 1.911-2(b), Income Tax
Regs.

The general rule of section 911(d)(1) is subject to an
exception under section 911(d)(3) which provides that "An

---

[26](...continued)

> (B) a citizen or resident of the United
> States and who, during any period of 12
> consecutive months, is present in a foreign
> country or countries during at least 330 full days
> in such period.

[27] Neither party argued the physical presence test applied
to this case.

individual shall not be treated as having a tax home in a foreign country for any period for which his abode is within the United States."

With respect to the term "abode", section 1.911-2(b), Income Tax Regs., provides that

Temporary presence of the individual in the United States does not necessarily mean that the individual's abode is in the United States during that time. Maintenance of a dwelling in the United States by an individual, whether or not that dwelling is used by the individual's spouse and dependents, does not necessarily mean that the individual's abode is in the United States.

The Court has held:

While an exact definition of "abode" depends upon the context in which the word is used, it clearly does not mean one's principal place of business. Thus, "abode" has a domestic rather than vocational meaning, and stands in contrast to "tax home" as defined for purposes of section 162(a)(2).

Bujol v. Commissioner, T.C. Memo. 1987-230, affd. without published opinion 842 F.2d 328 (5th Cir. 1988).

Respondent concedes that petitioner was entitled to the foreign earned income exclusion under section 911(a) from January 1 through April 30, 1999. Respondent, however, contends that petitioner left Japan and took up residence at the Rivercliff property on May 1, 1999, and lived there throughout the remainder of 1999. Respondent asserts that as of May 1, 1999, petitioner's abode was within the United States and as of that date he was no longer a qualified individual under section 911(d)(1). Therefore,

respondent argues petitioner was not entitled to the foreign earned income exclusion under section 911(a) from May 1 through December 31, 1999.

Petitioner contends that he was only temporarily in the United States in 1999 and merely provided maintenance for his family's dwelling on the Rivercliff property.  As a result, he argues that pursuant to section 911(d)(3) and section 1.911-2(b), Income Tax Regs., his tax home remained in Japan throughout 1999.

On at least three occasions, petitioner informed Multnomah County by correspondence that he and his family intended to begin using the Rivercliff property as their permanent residence in the spring of 1999.  On June 29, 1999, petitioner mailed a letter to Multnomah County stating that he and his family had not attended a May 21, 1999, appeal hearing because they had been in the process of moving from their former Japanese residence to their new permanent residence at the Rivercliff property.  The June 29, 1999, letter also stated petitioner and his family were presently residing on the Rivercliff property permanently.

Kumiko Talmage testified that she, petitioner, and Lillian Talmage moved to the Rivercliff property on June 9, 1999, with the intention of living there permanently, while petitioner occasionally returned to Japan to conduct business.

Petitioner testified that only Kumiko and Lillian Talmage intended to move to the Rivercliff property in the spring of 1999.

He claimed that after he helped them move to the Rivercliff property on June 9, 1999, he immediately returned to Japan to reside at an "extended-stay facility" to complete several pending business matters. Outside of occasionally traveling to the United States to visit his family, he claimed he did not depart from Japan to reside permanently on the Rivercliff property until January 2000.

In support of his testimony, petitioner produced copies of three checks. Each check was from his US Bank checking account and listed his address as the Rivercliff property address. The first check, dated November 4, 1999, was made out to Delta Airlines for $704.53. Although petitioner asserted it was his payment for a flight from Japan to Oregon to visit his family, the face of the check does not indicate a point of departure or a destination, and petitioner's reconstructed records state that the $704.53 paid to Delta Airlines was for a "Farm Travel Expense".

The second check, dated December 11, 1999, was made out to "SHADOW" for $1,000 for "TALMAGE TRANSPORT". Petitioner testified that it was payment for the transportation of his automobile from Japan to Oregon. However, his reconstructed records state that the $1,000 was an "Expense for NCPL Animals". The third check, dated December 27, 1999, was made out to the Oregon Department of Motor Vehicles for $97. Petitioner testified that it was payment to register his automobile. Petitioner's reconstructed records

state that the $97 was a "Farm Truck Expense".  The Court finds
that petitioner's testimony was not credible.

The evidence indicates petitioner's tax home was in Japan
for approximately 21 years ending on June 8, 1999.  Although the
period of bona fide residence must include an entire taxable year,
the entire uninterrupted period of residence may include
fractional parts of a taxable year.  See sec. 1.911-3(d)(3),
Income Tax Regs.  For the foregoing reasons, the Court finds that
petitioner was a qualified individual under section 911(d)(1) from
January 1 through June 8, 1999.  Therefore, petitioner was
entitled to the foreign earned income exclusion under section
911(a) from January 1 through June 8, 1999.  See sec. 1.911-
3(d)(2), Income Tax Regs.

The Court also finds that petitioner established his abode in
the United States as of June 9, 1999.  Accordingly, he was not
entitled to the foreign earned income exclusion under section
911(a) from June 9 through December 31, 1999.[28]

B.    Maximum Exclusion Amount

Generally, the allowable maximum exclusion from foreign
earned income for a tax year under section 911(a)(1) would be the
lesser of the qualified individual's foreign income for the

---

[28] Because the Court found that petitioner failed to meet
the tax home requirement under sec. 911(d)(1), the Court does not
need to determine whether petitioner met the bona fide residence
test or the physical presence test under sec. 911(d)(1)(A) or
(B).

taxable year in excess of amounts that the individual elected to exclude from gross income under section 911(a)(2) or the annual exclusion amount provided in section 911(b)(2)(D).[29]  Sec. 1.911-3(d)(2), Income Tax Regs.  The maximum exclusion from foreign earned income in 1999 was $74,000.  Sec. 911(b)(2)(D)(i).

If a taxpayer qualifies for the section 911(a)(1) exclusion for only a portion of the year, the annual exclusion amount under section 911(b)(2)(D) is prorated, and the maximum exclusion amount is the annual exclusion amount for the year, multiplied by a fraction whose numerator is the number of qualifying days in the taxable year and whose denominator is the number of days in the year.  Sec. 1.911-3(d)(2), Income Tax Regs.  A qualifying day is a day on which the taxpayer was a qualified individual under section 911(d)(1).  Sec. 1.911-3(d)(3), Income Tax Regs.

Petitioner had 159 qualifying days in 1999.  Thus petitioner's maximum exclusion from foreign earned income for 1999 is $32,236 (159 (qualifying days) divided by 365 (days in taxable year) multiplied by $74,000 (annual exclusion amount for 1999)).

---

[29] Petitioner did not make a sec. 911(a)(2) election.

V.    Additions to Tax and Penalties

    A.    Whether Petitioner Is Liable for Fraud Penalties Under Section 6663(a)

        1.    Background

Section 6663(a) imposes a penalty of "an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud."  Section 6663(b) specifies that if any portion of the underpayment is attributable to fraud, the entire underpayment shall be treated as attributable thereto except to the extent the taxpayer establishes, by a preponderance of the evidence, that some part is not due to fraud.  Where taxpayers file a joint return, section 6663 does not apply to a spouse unless some part of the underpayment is due to the fraud of the spouse.  Sec. 6663(c).

When asserting liability under the fraud penalty, the Commissioner has the burden of proving, by clear and convincing evidence, that (1) the taxpayer underpaid his income taxes for each year, and (2) that some portion of the underpayment is due to fraud.  Sec. 7454(a); Rule 142(b); King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 515-516 (1992); Truesdell v. Commissioner, 89 T.C. 1280, 1301 (1987).

The existence of fraud is a question of fact to be resolved from the entire record.  DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published

opinion 578 F.2d 1383 (8th Cir. 1978).  Because fraud can rarely be established by direct proof of the taxpayer's intention, fraud may be established by circumstantial evidence and reasonable inferences drawn from the record.  DiLeo v. Commissioner, supra at 874-875; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

In Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601, the U.S. Court of Appeals for the Ninth Circuit set forth a nonexclusive list of circumstantial factors that may give rise to a finding of fraudulent intent.  Such "badges of fraud" include:  (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; and (6) failure to cooperate with tax authorities.  Although no single badge is necessarily sufficient to establish fraud, the existence of several badges of fraud constitutes persuasive circumstantial evidence of fraud.  Petzoldt v. Commissioner, 92 T.C. at 700.

## 2.   Understatement of Income

Respondent's burden of proving an underpayment of tax attributable to unreported income may be satisfied in either of two ways:  (1) By proving a likely source of the unreported income, or (2) by disproving any alleged nontaxable source.  Dileo v. Commissioner, supra at 873-874.  Respondent has proved, by clear and convincing evidence, that petitioner received unreported

income from the sale of the Vancouver and Black Butte properties in 1998 and that the overseas wire transfers in 1998, 1999, 2000, 2001, and 2002 were not loans as asserted by petitioner.

Petitioner consistently failed to report substantial amounts of income in each year at issue. This failure is strong evidence of fraudulent intent. See Kurnick v. Commissioner, 232 F.2d 678 (6th Cir. 1956) (consistent, substantial understatement of income for several years is highly persuasive evidence of intent to defraud the government), affg. T.C. Memo. 1955-31; Conforte v. Commissioner, 74 T.C. 1160, 1201 (1980), affd. in part and revd. on another issue 692 F.2d 587 (9th Cir. 1982); Otsuki v. Commissioner, 53 T.C. 96, 107-108 (1969); see also Baumgardner v. Commissioner, 251 F.2d 311, 316 (9th Cir. 1957), affg. T.C. Memo. 1956-112.

### 3. Inadequate Books and Records

Petitioner made available to respondent his records from three checking accounts in the United States and his Federal income tax returns for the years at issue. In preparation for the trial, petitioner hired an accountant, Judy Killian (Ms. Killian), to reconstruct his financial transactions from 1998 through 2005. At trial, petitioner produced Ms. Killian's report of his reconstructed records and asserted that the report was evidence demonstrating petitioner properly maintained books and records and cooperated with respondent's investigation. To the contrary,

petitioner's records had to be reconstructed because he failed to maintain proper books and records in the first place.

### 4. Failure To File Income Tax Returns

Petitioner filed untimely Federal income tax returns for the years at issue, all of which substantially underreported income.

### 5. Implausible or Inconsistent Explanations of Behavior

#### a. Rivercliff Property Ownership and Advanced Funds

The record shows that the Talmages purchased the Rivercliff property on November 17, 1997, and it was titled in both their names until Kumiko Talmage conveyed her 50-percent interest to petitioner as part of the divorce settlement on August 20, 2001. Throughout this period, petitioner represented to Kumiko Talmage, Multnomah County, the Multnomah County Circuit Court, Mr. Schommer, Mr. Larson (petitioner's divorce attorney), Diane E. Rulien (Kumiko Talmage's divorce attorney), Mr. Seymour (NCPL's attorney) and Steven L. Pfeiffer (petitioner's property law attorney) that the Talmages owned the Rivercliff property jointly. The record also shows that after Kumiko Talmage conveyed her 50-percent interest to him, petitioner was the sole owner of the property until he transferred it to RFI on June 30, 2005. Petitioner also occupied the property as his primary residence from June 9, 1999, through the date of trial.

In the March 17, 2004, meeting with Agents Rans and Beach, petitioner stated that he owned only the original dwelling on the Rivercliff property and the barn. On September 9, 2004, petitioner signed a memorandum of confirmation and agreement with NCPL which stated that the original intention was to own the Rivercliff property as a 50-50 joint venture between petitioner and NCPL. After the notices of deficiency were issued, petitioner's story further evolved. He claimed he owned the Rivercliff property and that the funds transferred to purchase, develop, and operate the property were nontaxable loans.

Petitioner and Kumiko Talmage designed the new home on the Rivercliff property, petitioner developed the property, and petitioner occupied the property as his primary residence from June 9, 1999, through the date of trial. Even after the Rivercliff property was transferred, RFI purportedly hired petitioners as caretakers for the property, allowing them to reside in the Rivercliff property's new multimillion-dollar home and enjoy full use of the property. Despite all his machinations, from the time petitioner purchased the Rivercliff property, he had full use, control, and benefit of the property.

Petitioner's explanations to respondent and his testimony at trial with respect to the ownership of the Rivercliff property were inconsistent and implausible and were created for the sole purpose of misleading respondent, and the Court finds that

petitioner misrepresented his ownership in the Rivercliff property for the purpose of evading income tax.

b.   Funds Advanced for Petitioner's Family Support Obligations

Petitioner represented in his letter to respondent dated April 8, 2004, that his obligations to Kumiko Talmage pursuant to the stipulated judgment in the divorce case were no longer his personal obligations because they had been assumed by NCPL to buy Kumiko Talmage's equity position in the Rivercliff property. However, Kumiko Talmage transferred her ownership interest to petitioner, not NCPL, in accordance with the stipulated judgment, and petitioner held sole legal title to the Rivercliff property from August 20, 2001, until June 30, 2005, after the notices of deficiency were filed. Petitioner subsequently claimed that the funds advanced by NCPL to pay his family support obligations were loans which were paid in full when he transferred the Rivercliff property to RFI.

Petitioner's positions regarding his mandatory support and interest payments were inconsistent and implausible, and we find that he intended to conceal from respondent the true nature of these payments for the purpose of evading income tax.

6.   Concealment

Fraud is shown by proof that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead,

or otherwise prevent the collection of taxes.  Rowlee v. Commissioner, 80 T.C. at 1123.

Respondent's initial contact came from Japanese tax authorities.  When respondent's agents made direct inquiries to petitioner about the source of the funds advanced and the identity of the owners of NCPL and TPPL, petitioner refused to disclose information based upon the confidentiality agreement he signed with NCPL.  The confidentiality agreement provided that petitioner had to keep all company "Information" confidential.  However, when the party requesting information and documentation was a governmental authority, the confidentiality agreement did not prohibit petitioner from complying with its requests.  It only required petitioner to give NCPL prompt notice and to cooperate with it to obtain a protective order or other reliable assurance that any company information unrelated to petitioner would be kept confidential.  Even when respondent provided petitioner the opportunity to verify that he did not have bank accounts or signatory authority over bank accounts in Hong Kong, he refused to sign the consent directives, claiming he so refused under instructions from his employer pursuant to the confidentiality agreement.  There is no corroborating documentation from NCPL to that effect.

On this record, petitioner's conduct evidences an intent to conceal income and assets to mislead respondent for the purpose of evading tax.

### 7. Failure To Cooperate With Tax Authorities

Petitioner was not cooperative or forthright with respondent. Throughout the examination and pretrial stages of this case petitioner resisted disclosure of documentation and information requested by respondent directly related to his employment and his relation to his purported employer. When responding to questions, he gave contradictory and misleading answers. On this record, petitioner failed to cooperate with the tax authorities.

### 8. Underpayment Attributable to Fraud

After consideration of all the relevant factors, the Court concludes respondent proved by clear and convincing evidence that petitioner's underpayments of tax with respect to the funds wire transferred to him in the years at issue were attributable to fraud under section 6663(a). Therefore, the underpayment of tax attributable to the gains petitioner recognized from the sales of the Vancouver and Black Butte properties are also attributable to fraud unless he can establish by a preponderance of the evidence

that a portion of the underpayment was not fraudulent.[30]  See sec. 6663(b).

With respect to the Vancouver property, petitioner testified that he was opposed to purchasing the property, he was not involved in leasing the property, and he did not report income earned or claim losses incurred from leasing the property.  He considered Kumiko Talmage to be the sole owner of the Vancouver property.  Nevertheless, the evidence clearly establishes that he owned a 50-percent interest in the Vancouver property and did not report his portion of the gain when it was sold.  Petitioner has failed to prove, by a preponderance of evidence, that the failure to report the gain on the Vancouver property was not fraudulent.

With respect to the Black Butte property, petitioner testified that he had understood from the tax software program he was using he was entitled to roll the $60,303 realized from the sale of the Black Butte property into the Rivercliff property tax free. Petitioner is a sophisticated taxpayer who has a degree in business administration and has provided advice on various financial transactions for over 25 years.  Petitioner's testimony is not credible.  Petitioner has failed to prove, by a

---

[30] Respondent did not apply the fraud penalty under sec. 6663(a) to the underpayment of tax attributable to respondent's finding petitioner was not entitled to the full amount of the foreign earned income exclusion for 1999 and the Schedule F losses for 2000, 2001, and 2002, which petitioner conceded.

preponderance of evidence, that the failure to report the gain on the Black Butte property was not fraudulent.

For the foregoing reasons, the Court finds that petitioner's failure to report the $15,616 from the sale of the Vancouver property and the $60,303 from the sale of the Black Butte property was due to fraud.

B.    Section 6662 Accuracy-Related Penalty

Section 6662(a) imposes a 20-percent accuracy-related penalty on the portion of any underpayment attributable to negligence or disregard of rules or regulations.  Sec. 6662(b).  The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return.  Sec. 1.6662-3(b)(1), Income Tax Regs.  Respondent bears the burden of production with respect to any penalty or addition to tax.  Sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  To meet his burden of production, respondent must come forward with sufficient evidence indicating that it is appropriate to impose the penalty.  Higbee v. Commissioner, supra at 446-447.

Respondent contends Annette C. Talmage is liable for the accuracy-related penalty for 2002 under section 6662(a) on the same underpayment of tax upon which the Court found petitioner liable for the fraud penalty under section 6663(a).

Section 6662(a) does not apply to any portion of an underpayment subject to the fraud penalty under section 6663. Sec. 6662(b).  When a joint return is filed and one spouse is found liable for the fraud penalty, imposing the accuracy-related penalty on the other spouse with respect to the same underpayment would result in impermissible stacking.  Said v. Commissioner, T.C. Memo. 2003-148; Zaban v. Commissioner, T.C. Memo. 1997-479.

Petitioners filed a joint return for 2002.  Respondent imposed the accuracy-related penalty on Annette C. Talmage for the same underpayment of tax upon which the Court found petitioner liable for the fraud penalty.  Therefore, the Court finds that imposing the accuracy-related penalty on her would result in impermissible stacking.  Accordingly, Annette C. Talmage is not liable for the section 6662(a) accuracy-related penalty for 2002.

C.   Section 6651(a)(1) Addition to Tax

Section 6651(a)(1) imposes an addition to tax for failure to timely file a return.  The parties stipulated petitioner failed to timely file income tax returns for 1998 and 1999.  Therefore, the Court finds respondent met his burden of production.

Because respondent has met his burden, petitioner bears the burden of proving his failure to timely file was due to reasonable cause and not willful neglect.  To show reasonable cause, petitioner must show he "exercised ordinary business care and prudence and was nevertheless unable to file the return within the

prescribed time". Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. For illness or incapacity to constitute reasonable cause, petitioner must show he was incapacitated to a degree that he could not file his returns. Williams v. Commissioner, 16 T.C. 893, 905-906 (1951); see, e.g., Joseph v. Commissioner, T.C. Memo. 2003-19 ("Illness or incapacity may constitute reasonable cause if the taxpayer establishes that he was so ill that he was unable to file").

Petitioner contends that emotional distress caused by his marital discord was reasonable cause for his failure to timely file. However, he produced no evidence indicating the stress caused him to be incapacitated and unable to prepare his returns on the dates they were due.

Therefore, the Court finds petitioner did not have reasonable cause for failing to timely file. Accordingly, petitioner is liable for the section 6651(a)(1) addition to tax for 1998 and 1999.

VI. Statute of Limitations

Because the Court has found that petitioner fraudulently underreported his income and underpaid his income tax in 1999 and 2000, the Court finds that respondent is not barred by section 6501(a) from assessing deficiencies with respect to petitioner's 1999 and 2000 tax years. See sec. 6501(c).

The Court, in reaching its holding, has considered all arguments made and concludes that any arguments not mentioned above are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.